Dtjreee, Judge,
delivered the opinion of the court:
This case is before us pursuant to a special Act of Congress* in which we are asked to determine whether plaintiff herein has any legal or equitable claim, notwithstanding the statute of limitations, for losses alleged by plaintiff as the result of the performance of a contract with defendant dated April 17, 1944.
Plaintiff had perfected the “Gadi” lithographing process which was peculiarly adapted to wartime needs of the Air Force for great speed and large volume in the reproduction of mechanical drawings, and because of the inadequacy of the standard blueprint process of reproduction then in use. Plaintiff first offered to give this un-patented process to the Government, but finally agreed to produce Gadi prints as a prime contractor. The contract of April 17, 1944, provided for price redetermination after a “trial run,” and for specified deliveries over a four-month period. Later this provision was eliminated by a supplemental agreement providing for a “call contract” at specific prices. Production was extended through change orders on the call period to March 31,1946, for the convenience of the Government, and production was not finally terminated until May 31,1946.
Plaintiff now seeks damages for breach of contract, both express and implied, under five claims. Making allowance for duplication of claims where stated in the alternative, plaintiff’s total claims amount to $899,839.19, as follows:
The first claim is:
For the cost of surplus materials remaining at termination of the contract which materials could not be *165 disposed of by plaintiff and were unusable in its regular busmess amounting to $16,406.88, plus estimated storage cost of such materials in the sum of $3,480.00 for a total of $19,886.88.
The second claim is:
For out-of-pocket expenses incurred by plaintiff under an implied-in-fact contract during the period beginning January 1, 1946, and ending May 31, 1946, amounting to $67,952.31.
The third claim is:
Under an implied-in-fact contract for the development and perfection of the Gadi reproduction process, hereinafter described, in the estimated sum of $230,000.
The fourth claim is:
Under an implied-in-fact contract for the alleged cost of locating a suitable building and machinery and setting up the Gadi process plant for production, the estimated sum of $10,000.
The fifth claim is:
For damages and loss of profits resulting from an alleged breach of contract by the defendant the total sum of $572,000.[1]
The third claim for $230,000 has been withdrawn by plaintiff to the extent that plaintiff now asserts that a jury verdict for damages (losses) including loss of profits it would have earned, will fairly reimburse plaintiff for this claim.
Private bills were passed by the 81st and 83rd Congress providing for direct payment of the first two claims in the total sum of $84,359.19, but both bills were vetoed. Thereafter, the 84th Congress passed the present bill, which is not limited to any specific claims of plaintiff, but confers jurisdiction to render judgment upon plaintiff’s claim for “losses alleged to have been sustained” as a result of the performance of the contract.
Plaintiff urges that since the last three claims are estimated and unliquidated, they are for judicial determination *166 only. Plaintiff contends that since Private Law 665 now before ns is silent as to the intent of Congress in striking ont the provision in the House version of the present bill which limited the claim for reimbursement “of actual expenses,” the terms of the private law do not limit plaintiff’s claim to the amounts stated for actual expenses in the first two claims, totaling $87,839.19. Plaintiff urges that the last three claims for a total of over $800,000 are estimated and unliquidated, and that they are also subject to our judicial determination pursuant to the Congressional reference.
Although the bill as enacted did strike out the limitation to “actual expenses” proposed in the House version, it limited the claims to “losses alleged to have been sustained.” Clearly, Congress did not intend to suspend the statute of limitations applicable to this court and give plaintiff carte blanche tb assert in this court any new claims not hitherto alleged either before any administrative agency or before the Congress.
The legislative history, of the present private bill and the two previously vetoed bills makes it clear that the only claims or losses plaintiff ever alleged during the Congressional hearings thereon were under the first two claims hereinbefore stated, totaling $87,839.19. There is no evidence that plaintiff ever alleged any losses sustained under the contract as to the third, fourth, and fifth claims hereinbefore stated for additional total damages of over $800,000 until it filed the petition in this case.
In answer to specific questioning in hearings on the two previously vetoed bills plaintiff advised the Congressional subcommittee that plaintiff had no other claims than the first two claims it now asserts in this proceeding.
Clearly, the new third, fourth and fifth claims of plaintiff were not within the contemplation or intent of Congress when it asked us to determine and enter judgment upon a specific’ claim by plaintiff “for losses alleged to have been sustained * * * as a result of the performance of a contract.” The only claims of which Congress was made aware were the first two claims to which we have referred, and these are the only claims upon which we can take jurisdiction under the Private Act. Jurisdiction is necessarily restricted *167 to the claim described in the bill, and the canse of action set np in the petition must be substantially the same. Choteau v. United States, 20 Ct. Cl. 250 (1885).
We must therefore conclude that the claims herein identified as the third, fourth and fifth claims, and as Counts III, IV and V of the petition, accrued more than six years before the filing of the petition in this action, and are barred by the statute of limitations. These claims are not within the scope of Private Law 665, or within the provision therein that suit upon “such claim” may be instituted within one year after the enactment of this Act, notwithstanding any statute of limitations or lapse of time.
We now turn to the first and second claims included in the Congressional reference. Under the terms of reference in the Private Act of Congress, jurisdiction is conferred upon this court to “hear, determine and render judgment” upon the claim presented to Congress as to the liability of the United States, if any, legal or equitable for losses alleged as the result of the performance of the contract with plaintiff dated April 17,1944, notwithstanding any statute of limitations or lapse of time.
Did the losses alleged by plaintiff on these two claims during 1946 occur as the result of the performance of the contract dated April 17, 1944?
Plaintiff made a formal claim in July 1946 in the sum of $22,189.69, for surplus materials remaining at termination of the contract, which could not be disposed of by plaintiff, and which were unusable in- its} regular business. This claim is now the first claim in this action. Subsequently, plaintiff was able to dispose of a portion of the surplus materials in the approximate amount of $5,782.21, thus reducing its first claim to $16,406.88. To this item plaintiff has added the estimated storage cost of such surplus materials estimated at $8,480 for a total under the first claim of $19,886.88. Plaintiff’s representative, Mr. Jones, was at first assured by defendant’s contracting officer that on completion of the contract, plaintiff would be reimbursed by defendant for the cost of any specialized Gadi materials on hand. This assurance was not embodied in the original written contract, which contained no specific provision in this regard, or in any *168 of tbe supplemental agreements. That part of the first claim which asks for reimbursement of storage charges for the period June 1,1946, to October 31,1958, in the sum of $3,480 is asserted for the first time in this suit. Although it is based upon the theory that the stored material was Government-owned property, defendant does not now have, nor has it ever had, title to this property. On the contrary, this is plaintiff’s own surplus property for the storage of which it now seeks reimbursement. Plaintiff has also asserted for the first time in this suit a claim of $15,168 for expenses of placing and maintaining Government-owned equipment and machinery in storage. This claim is estimated and not subject to verification, and it further appears that within a reasonable time after plaintiff’s request for removal of the Government property remaining in its plant, the Government furnished plaintiff with detailed instructions for packing and shipping its property. We conclude that plaintiff has no claim either legal or equitable, for either of these two items of storage charges of $3,480 and $15,168.
As to the balance of the first claim for surplus inventory amounting to $16,406.88 that could not be disposed of at the expiration of the contract in 1946, such supplies were purchased by plaintiff at the request of, and for the use of, defendant. The correct amount of this claim based upon our findings as to actual inventory costs is $16,370.87. The contracting officer and the contract negotiator assured plaintiff that, on completion of the contract, plaintiff could be reimbursed for the cost of any specialized Gadi materials on hand. The original contract contained no specific provision in this regard.
On its second claim, plaintiff seeks judgment upon an im~ plied-in-fact contract for its out-of-pocket expenses in maintaining the Gadi process division fully staffed and guarded on a wartime basis, under defendant’s instructions, for the period January 1, 1946, to May 31, 1946, in the sum of $67,952.31. The contract was amended on December 18, 1945, to extend the period for calls by defendant for specified production of Gadi prints to March 3, 1946, and plaintiff actually performed such work for defendant up to and including May 31,1946 when the work was finally discontinued. *169 During this final five-month period in 1946, plaintiff sustained the operating loss of $67,952.31 stated in its second claim herein. Plaintiff seeks recovery of this amount upon an alleged implied-in-fact contract, also alleging that the original contract as amended and modified was . void and inoperative as an executory agreement as of February 8,1945, for lack of consideration and mutuality.
As stated more specifically in our findings, plaintiff’s general business operations were conducted at a substantial profit for the three years 1944 through 1946. However, the profit experience for plaintiff’s Gadi Division was as follows (loss figures in parenthesis):

Gadi Division Profit before Year Tames

1944 _!_____ $122,868.91
1945 _ (133,958.71)
1946 _ (96,980.05)
Total loss before taxes — Gadi operation-($105, 069. 85)
Defendant’s payments to plaintiff under the original contract and amendments thereto over this same three-year period amounted to $2,029,185.29.
These first two claims for reimbursement for unused: surplus materials and for operating losses in 1946 were presented to the Air Materiel Command within two months after final termination of the Gadi operations by, plaintiff. The Command recommended payment on the basis of equitable entitlement in its report of January 13, 1947, for reasons therein stated as follows (finding 4) :
(1) Claimant was requested by Army personnel to set up a plant to make Gadi prints,, was assured of adequate financial assistance and was informed of tremendous volumes of work which would be. involved. Claimant would never have entered the project without such assurances. It operated at capacity or near capacity only during the year 1944 although it was definitely led to believe that it would receive orders for near-capacity production throughout the war.
(2) Claimant developed an excellent method of reproduction of mechanical drawings which is the method which would be used almost exclusively in the event of another war although it is not practical for the very small quantity reproduction required in peacetime.
*170 (3) Claimant was assured at the times of the extensions of its contract that it would receive much more work in the future and that, therefore, it could safely accept the extensions.
(4) Claimant saved the Government considerable money, amounting, it is believed, to approximately $2,000,000 in reproduction and handling costs.
(5) Claimant’s losses were not caused by its own inefficiency or unduly high costs but by its having fixed its prices at too low rates because of continued assurances that it would receive orders for work of a type and m quantities sufficient at least to prevent losses. (Emphasis supplied).
The Comptroller General disallowed the two claims on the ground that there was no obligation therefor under the contract. Payment of these same two claims in the total sum of $84,359.19 was authorized by private bills in the 81st and 83rd Congress, but were vetoed and thereafter the present bill was enacted and approved. Apparently both the Air Force and Congress believed that plaintiff was clearly entitled to the payment of these first two claims on an equitable basis.
Under the tremendous wartime requirements for reproduction of mechanical drawings of aircraft components by 1944, nearly 19 million manufacturers’ drawings lay unprocessed, largely due to the slowness of the blueprint process then used by the Air Force. In the words of the officer in charge of this operation, the blueprinting facilities were “hopelessly swamped.” The Government concluded that plaintiff’s Gadi process was the solution to this serious crisis. Plaintiff first offered to give the Gadi process to the Government because plaintiff did not have the plant facilities required. In 1943 plaintiff was a relatively small but successful company engaged largely in making fine printing plates for the lithograph industry. It had never been engaged in the reproduction of mechanical drawings, and its available production was fully committed under other contracts. Plaintiff was first advised that the Government could not accept its gratuitous offer of the Gadi process because the Government did not have the necessary production facilities. Thereafter the original negotiations were conducted with the understanding that the Government would furnish the *171 needed facilities for plaintiff; the project to be Government-owned and operated by plaintiff under a management contract. Later plaintiff was advised that it would be necessary for it to perform the proposed project as a prime contractor. Although plaintiff at first objected to that arrangement because of its fear of losses thereunder, a letter contract was finally entered into in January 1944. In April 1944 the first formal written contract was executed, establishing required production schedules at specified prices on or before July 10, 1944. This date was extended by change orders to February 8,1945.
Despite early production difficulties during 1944 which were caused by the Government furnishing plaintiff with defective original drawings for reproduction and by unreasonable inspection standards, plaintiff performed its contract with such efficiency that within the first six months of 1944 the tremendous backlog of about 19 million unprocessed drawings needed for wartime aircraft production had been eliminated. By October 1944 its contract schedule was completely current. Plaintiff made a profit of $127,868.91 on this project for the year 1944, and defendant’s contracting officer estimated that the Government had saved over $500,000 from the former reproduction method by use of the Gadi process during the same year. Apparently this happy combination of propitious circumstances was just too good to be true. On December 6,1944, the Chief of the Maintenance Data Section of the Army Air Force requested termination of the contract on the ground that the previous backlog had been dissipated, and current requirements for prints had been materially reduced.
The Government then concluded that this should not be done, and a new Supplemental Agreement No. 5 was executed by the parties, converting the agreement to a call contract at unit prices in an aggregate amount of $1,995,222 up to June 30, 1945. This period was later extended by change orders through March 31, 1946. The former provision for renegotiating prices was eliminated.
The record is clear that the Government, confronted with a critical wartime problem of vital aircraft production, for which plaintiff offered to give the solution with its *172 Gadi process, instead induced plaintiff to manufacture Gadi prints and gave positive assurance that it would be given orders for work of a type and in quantities sufficient to at least prevent losses. Although this assurance was never written into these contracts, the record is equally clear that plaintiff signed the contracts without counsel or outside consultation, and in reliance upon this assurance by the Government. In fact, its trust was so complete that even the representatives of the Government felt compelled to warn it to beware at the time the contract was changed. Under such circumstances this transaction bore little actual resemblance to the usual arpi’s-length bargaining between the Government and a successful competitive bidder over the formation of a contract.
During the concluding period January 1, 1946, through May 31, 1946, in which plaintiff alleges that it sustained the losses and damages alleged in the first two claims, there was no written contract in effect after March 31, 1946, since it had then expired. However, plaintiff continued to perform some work at the request of defendant until the latter part of May 1946.
Plaintiff lost $16,370.87 under its first claim for unused surplus materials, and $67,952.31 on its second claim for operating expenses during the concluding five months of operations in 1946, in addition to its losses in 1945. We concur with the conclusion of the Government’s Air Materiel Command that these losses by plaintiff “were not caused by its own inefficiency or unduly high costs bu't by its having fixed its prices at too low rates because of continued assurances that it would receive orders for work of a type and in quantities sufficient to at least prevent losses.”
It is clear that both parties intended that this assurance against loss was to be part of the entire agreement, although it was not included in the written contracts.' This court has equitable jurisdiction to reform the contract so as to express the understanding and intention of the parties, and for the purpose of determining whether the claim, if established, is a valid one against the United States, and having so determined, to award a money judgment. Iowa-Wisconsin Bridge Company v. United States, 114 Ct. Cl. 464 (1949), *173 cert. denied 339 U.S. 982. We are not allowing recovery on the basis that every wartime contractor is equitably entitled to protection against loss, but solely because this plaintiff’s particular understanding with the Air Force was that it would receive work of a type and in quantities sufficient to prevent losses. As to these two claims, the bar of the statute of limitations is removed by the Private Act of Congress.
We declare the contract reformed to provide that defendant agreed to furnish work thereunder of a type and in quantities sufficient to prevent losses to plaintiff. We conclude that plaintiff has a valid claim against defendant on its first claim, or Count I of its petition, in the sum of $16,-370.87 for unused surplus materials, and a valid claim against defendant on its second claim for operating losses in 1946, or Count II of its petition, in the sum of $67,952.31. As to all other claims or counts alleged by plaintiff, the petition is dismissed.
It is so ordered.
Davis, Judge; Laeamoee, Judge; Whitauee, Judge; and Jones, Chief Judge, concur.
BINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Lloyd Fletcher, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is, and at all times involved herein, was a corporation chartered and existing under the laws of the State of Ohio, with its principal office and place of business in Toledo, Ohio. In 1958 plaintiff’s name was changed from Graphic Arts Corporation of Ohio to Jones & Sears, Inc.
This case is before the court pursuant to the following special act of Congress:
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claim of the Graphic Arts Corporation of Ohio, Toledo, Ohio, as to the liability of the United States, if any, either legal or equitable, for losses alleged to have been sustained by the said Graphic Arts Corporation of Ohio as the result of the performance of a *174 contract, Numbered W33-038ac 2023, dated April 17, 1944, entered into with the United States Army Air Corps.
Sec. 2. Notwithstanding any statute of limitations or lapse of time, suit upon such claim may be instituted by the claimant within one year after the date of enactment of this Act. Proceedings for the determination of such claim and review thereof, and payment of any judgment thereon, shall be had as in the case of claims over which such court has jurisdiction under section 1491 of title 28 of the United States Code.
Sec. 3. Nothing contained in this Act shall be construed as an inference of liability on the part of the United States Government. (Private Law 665, 84th Cong., 2d Sess., H.E. 2893, approved May 24,1956.)
Suit was instituted by plaintiff within the period of time allowed by Section 2 of the act by filing its petition in this court on May 15,1957.
2. In its petition the plaintiff has asserted its several claims against the defendant on varying allegations of breach of contract, the alleged existence of implied-in-fáct contracts, and a request for reformation of contract. Making allowance for duplication of claims where stated in the alternative, the plaintiff’s total claims against the defendant amount to $899,839.19, which may be summarized as follows:
(a) For the cost of surplus materials remaining at termination of the contract which materials could not be disposed of by plaintiff and were unusable in its regular business amounting to $16,406.88, plus estimated storage cost of such materials in the sum of $3,480.00 for a total of $19,886.88.
(b) For out-of-pocket expenses incurred by plaintiff under an implied-in-fact contract during the period beginning January 1, 1946, and ending May 31, 1946, amounting to $67,952.31.
(c) Under an implied-in-fact contract for the development and perfection of the Gadi reproduction process, hereinafter described, in the estimated sum of $230,000.
(d) Under an implied-in-fact contract for the alleged cost of locating a suitable building and machinery and setting up the Gadi process plant for production, the estimated sum of $10,000.
*175 (e) For damages and loss of profits resulting from an alleged breach of contract by the defendant the total sum of $572,000.[2]
8. The claims set forth in subparagraphs (c), (d), and (e) of the preceding finding have been asserted against the defendant for the first time in this suit. The legislative history of Private Law 665, supra, discloses that the only claims of the plaintiff considered by the Congress and the President in passing and approving the bill were the claims described in subparagraphs (a) and (b) of the preceding finding (excluding estimated storage charges referred to in sub-paragraph (a)). The other claims were never presented by plaintiff to the Congress, or to any other department or agency of the Government. In fact, in answer to specific questioning, plaintiff’s representative advised the Congressional subcommittee that plaintiff had “no other claims.” For these reasons the defendant asserts that such other claims are beyond the scope of Private Law 665 and hence are barred by the statute of limitations.
4. The legislative history of Private Law 665, supra, further discloses that in July 1946 the plaintiff made a formal claim for the cost of surplus materials referred to in finding 2 (a), in the sum of $22,189.69,[3] plus its Gadi Division operating expenses referred to in finding 2 (b) in the sum of $67,952.81. The Air Materiel Command at Wright Field, Dayton, Ohio, after investigation of these two claims decided that it had no power to pay them. However, the Command further concluded that plaintiff was equitably entitled to be paid the amount of those claims and recommended to the Commanding General, Army Air Force, Washington, D.C. that the claims be referred to the Comptroller General for consideration. In its report on the matter dated Jan- *176 nary 13, 1947, the Air Materiel Command stated in part as follows:
* * * * *
(f) Claimant believes that it is deserving of reimbursement of its losses on its Gadi plant during the first 5 months of 1946 including its excess Gadi supply inventory. This command agrees with claimant that it would be equitable to reimburse claimant for its losses but that the inventory should be taken over only in the event and to the extent necessary to prevent additional loss. The reasons for this command’s belief that the losses should be reimbursed are as follows:
(1) Claimant was requested by Army personnel to set up a plant to make Gadi prints, was assured of adequate financial assistance and was informed of tremendous volumes of work which would be involved. Claimant would never have entered the project without such assurances. It operated at capacity or near capacity only during the year 1944 although it was definitely led to believe that it would receive orders for near-capacity production throughout the war.
(2) Claimant developed an excellent method of reproduction of mechanical drawings which is the method which would be used almost exclusively in the event of another war although it is not practical for the very small quantity reproduction required in peacetime.
(3) Claimant was assured at the times of the extensions of its contract that it would receive much more work in the future and that, therefore, it could safely accept the extensions.
(4) Claimant saved the Government considerable money, amounting, it is believed, to approximately $2,000,000 in reproduction and handling costs.
(5) Claimant’s losses were not caused by its own inefficiency or unduly high costs but by its having fixed its prices at too low rates because of continued assurances that it would receive orders for work of a type and in quantities sufficient at least to prevent losses.
*****
Thereupon, the War Department transmitted the claims to the Comptroller General but without recommendation. On June 20,1947, the Comptroller General disallowed the claims on the ground that there was no obligation therefor under the contract. The two claims were thereafter presented by plaintiff to the 80th, 81st, 83d, and 84th Congresses, seeking legislative relief. Private bills granting plaintiff’s claims *177 and providing for tbe payment to it of $84,359.19 were passed by tbe 81st and 83d Congresses. Tbe bill passed by tbe 81st Congress was vetoed by President Plarry S. Truman. Tbe bill passed by the 83d Congress was vetoed by President Dwight D. Eisenhower. President Eisenhower’s veto message concluded with tbe following paragraphs:
‡ $ ‡ # ♦
My approval of this bill would establish the undesirable principle of Government underwriting any wartime losses incurred by contractors providing goods and services to the Government, regardless of the fact that such contractors did not sustain a net loss. I am unable to perceive any circumstances which would warrant preferential treatment for the claimant to the detriment of other wartime contractors. I am satisfied that it is my duty to oppose this bill
Although my examination of the record in this case does not lead me to believe that there is an equitable basis for this claim, it is possible that a court through judicial processes might be led to determine otherwise. In complex situations like this one, it is my opinion that judicial rather than legislative remedy should be sought. I would, therefore, be willing to give my approval to. a jurisdictional bill waiving the bar of any statute of limitations against the claim.
Thereafter, P.L. 665 was enacted and approved.
¡5. Plaintiff was incorporated in 1924 as a commercial art business. It later expanded its activities into various phases of the graphic arts, including lithographic platemaking, photoengraving, commercial photography, and rotogravure reproduction. Its major activity until 1944 was the making of fine printing plates for the lithographic industry. Prior to that time, plaintiff had not engaged in the operation of printing presses or the reproduction of mechanical drawings. Its major experience in the performance of contracts .with defendant had been in .extensive reproduction of maps for the Army Map Service. It was a relatively small, closely held corporation and operated its business from a small, rented building in the business district of Toledo, Ohio.
6. Mr. Ernest E. Jones was and is the president and majority stockholder of plaintiff; he was its major representative in the transactions with defendant herein described. *178 He is an expert in the field of graphic arts reproduction and has been active in committees of the Lithographic Technical Foundation, a leading research organization in lithography, as well as in other related associations. During World War II he served on a Government committee assigned to the task of improving map-making procedures and techniques. He had the leading role in developing the Gadi reproduction process hereinafter described.
7. In order that the Air Force may properly maintain and repair its aircraft, their engines and accessories, it is necessary that maintenance personnel be supplied with copies of the mechanical drawings as originally prepared by the manufacturers of the aircraft and components. In 1943, the responsibility for the reproduction of such drawings and distribution thereof to the field was that of a branch of the Air Materiel Command, Army Air Force, Wright Field, Dayton, Ohio, under the direction of Major E. J. Guyer. During that period these drawings, commonly referred to as “vandykes,” were being • reproduced exclusively by the blueprint method, using blueprinting equipment at Wright Field itself, together with all commercial bhieprinting facilities available in the surrounding area. Despite the most strenuous efforts on the part of Major Guyer and his staff, the tremendous wartime requirements for these drawings were such that the above-mentioned blueprinting facilities became, in Major Guyer’s words, “hopelessly swamped.” Nearly 19 million manufacturers’ drawings lay unprocessed and unreproduced. For the most part, the accumulation of this critical backlog was attributable to a shortage of skilled labor and to an inherent slo wness of the blueprinting process.
Major Guyer was beseeched on every side for drawings which he could not furnish. He sought the aid of leading companies in the field of reproducing engineering data but they were unable to lend any significant assistance due to commitment of their full facilities to other phases of the war effort.
8. In the summer of 1943, Mr. H. H. Southgate, a staff assistant to Major Guyer, discussed the above situation with Mr. Jones, who indicated an interest in the problem Thereafter, Mr. Southgate took Mr. Jones to Major Guyer’s office *179 at Wright Field, and Major Guyer explained to Mr. Jones in detail the critical situation existing by reason of the failure of the reproduction processes then existing to keep up with the demand. He explained further that any new reproduction method developed had to be cheap and fast and could not employ any strategic materials such as photographic film, rag-content paper, or metal plates. Mr. Jones immediately began a research and development program, returning to Wright Field on several occasions in order to inform himself more completely as to the AAF’s requirements. By early September of 1943, Mr. Jones and his research assistants had developed a reproduction process which combined the advantages of a legible product with fast reproduction thereof using an offset printing press without, however, requiring the use of any of the strategic materials referred to above. He gave to this new process the name gadi.[4] Mr. Jones then performed a demonstration of the new process for Major Guyer and other Government officials at the plaintiff’s plant in Toledo, Ohio. After witnessing the demonstration and testing the resulting product, Major Guyer and his associates were convinced that the Gadi process was successful and offered the long-sought-for solution to the difficult reproduction problem described above.
9. A sample Gadi print in evidence shows that the process has excellent reproduction qualities. Also, when large quantities of prints are required, the Gadi process is much faster and cheaper than the relatively slow photographic process of reproduction known as blueprinting. In mass production of prints, the Gadi process also showed other advantages over blueprint reproduction in that during the latter process the duplicated print is run through a wet solution which causes difficulty in handling as contrasted to Gadi prints which are dry and less bulky. In addition, at the time in question, blueprint reproductions had to be marked, cut, and folded by hand, whereas in the Gadi process the prints were machine-marked, cut, and folded, thus saving considerable labor.
*180 10. The Gadi process as a whole was a new development by Mr. Jones, although the general principles involved were known to the lithographic industry. A paper mastic plate impregnated with plastic and with a continuous tone coating solution thereon was made from the engineer drawing, or Vandyke, and this paper plate was placed on a stripped-down, modified offset press to make the required reproductions. The drawing was then printed upon a specially prepared wood-pulp paper which had been made waterproof and resistant to- deterioration by the addition of chemicals known as Uformite No. 467 and Melamine. A special waterproof ink was used which became a part of the paper on which the print was impressed. Both the waterproof paper and the waterproof ink were made by other companies pursuant to specifications supplied by Mr. Jones. He also developed a special clamp which enabled a change of plates to be made in less than a minute.
Despite elements of novelty in the Gadi process when viewed as a whole, the plaintiff never filed an application for patent thereon.[5] Mr. Jones explained the failure to file such an application as being due to his belief that the Gadi process was peculiarly adapted to wartime conditions where both great speed and large volume were desired. In normal commercial printing he did not believe that the Gadi process offered any particular advantage. The mechanical techniques and formulae used in the Gadi process have been retained by plaintiff for use by the Government in future emergencies, if desired.
11. Following the successful demonstration of the Gadi process, Mr. Jones offered to give it to the Government and to assist in the necessary training of AAF personnel, all as plaintiff’s contribution to the war effort. Major Guyer informed him that the Government was unable to accept his offer because it did not have the necessary plant, equipment, or labor available for such a project. Major Guyer then turned the matter over to the Contract Division, and the *181 responsibility for further negotiations with Mr. Jones was assigned to Lt. E. J. Taylor as contracting officer. Mr. J ones renewed to Lt. Taylor his offer to give the Gadi process to the Government, and Lt. Taylor again advised Mr. Jones of the reasons why the Government could not avail itself of Iris offer. The record in this case, particularly the testimony of Major Guyer and Lt. Taylor, supports the following statements made by Mr. Jones in a letter to the General Accounting Office under date of July 19,1946:
$ $ $ $ *
* * * without any expectation of reimbursement from the Government, we said that we were willing to turn the entire process, plans, etc., over to the Army Air Forces and assist them to the best of our ability to set up a plant and to put it in operation, helping them to train personnel for the work, etc., merely as our contribution to the war effort. We were urged to undertake the operation ourselves. * * *
* :{« sH * jH
At that time the writer made it entirely clear that Graphic Arts Corporation was not financially able to handle such an operation, but we were told again and again that the necessity for this was extreme, that the Government had neither plant nor personnel with which to set up this project, and that if we would set it up the Government would furnish the necessary financial assistance to help us set up plant, equipment, and everything connected with the operation. We were again told about how many months’ quotas of prints the 14 blue printing contractors and the Wright Field blueprint plant were behind; how vital was the need for these prints, and how the Vandykes which were piled up as a backlog awaiting processing, were increasing in spite of all that could be done * * *.
Under pressure, we agreed to go ahead with the project. * * *
12. Contract negotiations between the parties were entered into in September 1943, and continued throughout January 1944, when the letter contract described below was issued. In these conferences the plaintiff was represented by Mr. Jones, and the Government was represented by its contracting officer, Lt. Taylor, although other Government personnel also participated in the discussions from time to time. *182 Both. Lt. Taylor and Major Guy or were aware of Mr. Jones’ reluctance that plaintiff should act as a prime contractor on this project because he doubted plaintiff’s financial ability to do so. They were further aware that plaintiff’s existing plant and facilities were completely inadequate for the performance of the contemplated project and that the plaintiff’s regular organization was fully committed to the performance of another contract for the Army Map Service. The original negotiations, therefore, were conducted under the mutual understanding that the Government would obtain and furnish everything required for the production of Gadi prints, including a suitable building, facilities, machinery, supplies, and finances. At this stage of the negotiations it was intended and was mutually understood that the project would be Government-owned and would merely be operated by the plaintiff under a management contract. Because of the critical need for reproducing the required mechanical drawings as soon as possible, Mr. Jones was requested by AAF representatives to seek out a suitable building and other necessary facilities without awaiting the execution of a formal contract. He proceeded to do so. After considerable investigation, he determined the availability of the required equipment and located a six-story building in Toledo which he believed could be suitably reconditioned for the project. On October 13, 1948, he arranged for a 90-day option to purchase the building.[6] During this period of time, Mr. Jones and the Government representatives still intended that the project would be a Government-owned facility in its entirety with plaintiff operating it under a management contract.
13. The mutual understanding described in the preceding finding was changed in December 1943. At that time Lt. Taylor and another contracting officer, Captain C. K. Jones, informed Mr. Jones that, due to a policy change adopted at higher Government levels, it would no longer be possible for the Government to furnish the required building or to *183 have tbe Gadi project operated as a Government-owned facility under a management contract. They informed Mr. Jones that it would be necessary for the.plaintiff to perform the proposed project as a prime contractor. They further advised Mr. Jones, however, that the Government would bear the cost of the necessary equipment and machinery, that substantial sums of money could be advanced to plaintiff under any contract subsequently executed in order to assist plaintiff in financing the cost of the required building, and that a certificate of necessity would be obtained permitting plaintiff the advantage of a high amortization rate for tax purposes on the expected costs of remodeling and renovating the building. Mr. Jones again protested the financial inability of the plaintiff and restated his fear that it wotdd become involved in losses as a prime contractor. He further objected that, in reliance upon assurances that the project would be a Government-owned facility, he had caused the plaintiff to incur obligations which might impair its solvency. However, the record does not indicate that any such obligations were undertaken by plaintiff prior to this time although there did exist the possibility that the $500 deposit by plaintiff on the option for the purchase of the building might be forfeited.
14. Statements were made to Mr. Jones by Lt. Taylor and other Government representatives which he could reasonably interpret as their assurances that they would do everything possible to protect the plaintiff from losses in undertaking this project. Thereupon, Mr. Jones agreed to continue contract negotiations on the new basis of plaintiff acting as a prime contractor. The negotiations continued throughout the balance of December 1943 and January 1944. A short delay occurred due to a transfer of the responsibility for reproduction of mechanical drawings from the Production Engineering Division at Wright Field to the Supply Division at Patterson Field, Dayton, Ohio. In the latter division the officer charged with responsibility for the project was Col. John A. Ball who, by memorandum to the Commanding General of the Air Materiel Command under date of January 6,1944, requested the issuance of a letter of intent to the *184 plaintiff in order to enable the project to be started as soon as possible. Col. Ball’s memorandum read in pertinent part as follows:
The present process employed in the reproduction of mechanical drawings by the conventional blue print process is unsatisfactory. In addition the blue printing facilities of the Materiel Command and the Air Service Command combined are entirely inadequate to meet the present requirements due to lack of blue print operators, trimmers, folders and personnel for the packing and shipping facilities. To alleviate this condition, the services of commercial blue printers was [sic] obtained. * m *
*****
Although the method of employing commercial blue printers to obtain blue print requirements for the AAF Activities has materially aided in the printing and distribution of drawings, it is still far too costly and entirely inadequate to meet present day requirements to the extent that is necessary. * * *
*****
* * * It is therefore proposed to accomplish the reproduction of mechanical drawings by a lithographic process. This method is not the conventional lithographic process that requires the use of a metal plate but is somewhat similar. A paper plate has been developed by the Gadi Co., Toledo, O., a subsidiary of the Graphic Arts Corp. of Toledo, O. By employing this process, the negative Vandyke print will be used to obtain the paper negative for printing. This eliminates the use of an additional positive brown line print at present required for the blueprinting process. The lithographic process of reproduction of drawings will, in addition to expediting reproduction of drawings, thereby cleaning up the backlog almost immediately, create a savings in cost to the Government of $1,461,000.00 during the next 6 months as indicated below.
Blue print process:
45,000,000 prints at .1093 per print (5 sq. ft. average) _=$4, 918, 600. 00
New Lithographic Process:
46,000,000 prints at .0875 per print (5 sq. ft. average) _— 3, 457, 500. 00
Savings 1, 461, 000. 00
*185 Tbe Gadi Co. being located in Toledo, Ohio is not in the critical labor shortage area and will not require additional personnel to carry on this project. All other printers at present under contract for offset printing are not in a position to obtain sufficient personnel, materials and equipment to experiment with and carry on this project.
On the following day, Major Guyer also prepared a memorandum for procurement, approving the statements in Col. Ball’s memorandum, and stating in part as follows:
It is requested that every effort be made by Procurement Division to expedite the closing of this contract. The blueprint situation at Air Service Command is known to be in a serious condition at the present time and immediate measures must be taken to alleviate the existing condition.
In aggravation of the above backlog of 45,000,000 prints, new and revised drawings were being received by Air Service Command at this time at an average monthly rate of 60,000 which was estimated to average better than 25,000,000 square feet per month. The commercial blueprint contractors then being used had a capacity of about 30,000,000 square feet per month, but since all of them were more than 30 days behind schedule, they were unable to make any significant impression on the backlog of undistributed drawings.
15. On January 13, 1944, Capt. Charles K. Jones, as contracting officer, wrote the following letter to plaintiff under the subject heading of “Army Air Forces requirements of reproducing mechanical drawings”:
*186 1. Confirming telephone conversation of 12 January 1944 the requirements on the above subject are now as follows:
Current Backlog Total monthly requirement

Square feet Square feet Square feet

February.. 81,000,000 33,750,000 114,750,000
March_ 81,000,000 33,750,000 114,750,000
April_ 81,000,000 33,750,000 114,750,000
May_ 81,000,000 33,750,000 114,760,000
June.. 81,000,000 33,750,000 114,750,000
Total to June 30,1944.. 573,750,000
July. 81,000,000 33,750,000 114,760,000
August. 81,000,000 81,000,000
September.. 81,000,000 81,000,000
October.... 81,000,000 81,000,000
November.. 81,000,000 81,000,000
December.. 81,000,000 81,000,000
Total from July to December, inclusive_____ 619,750,000
Total requirement from February to December, inclusive...., 1,093,500,000
2. The backlog is scheduled to be cleaned up in six months.
8. It is requested that you submit to this office at the earliest possible moment an itemized list of the facilities required, separated as to those wanted on Certificate of Necessity and on D.P.C.
4. Advise by return mail when this information may be expected.
16. On January 19, 1944, the plaintiff submitted the following proposal to the defendant:
As per our conference yesterday as to the last projected demand for prints we have revised our schedule of prices as follows:

Per square foot

Quantities of from 100 to 150_ 0.012426
Quantities of from 150 to 300_0.012105
Quantities of from 300 up_0.011785
This price is based on present estimated costs and it is believed that price can be reduced when full production has been attained.
The above figures include picking up the Vandykes at Air Service Command and delivering the completed *187 Gadi Prints accurately counted, inspected, mechanically numbered and bundled with label to R. L. Polk & Company, Detroit, Michigan.
Trusting we may be favored with a contract for this work, we are
Yours very truly,
Geaphic Arts Corporation oe Ohio,
/s/ By Ernest E. Jones, President.
p.s. The above prices are based upon receiving a contract totaling not less than two million dollars (2,000,000.00) to be completed on or before 30 June 1944. These prices are also based upon the Government furnishing building on Certificate of Necessity and Facilities, Defense Plant Corp. as outlined in letters dated 15 January 1944.
17. A letter contract, No. W33-038 ac-2023, dated January 28, 1944, was accepted by the plaintiff on February 21,1944, and approved February 23, 1944, for the reproduction of 163,200,000 square feet of prints at a total estimated price of $2,000,000. It provided that the parties negotiate, looking toward the execution of a definitive contract by March 1,1944.[7] In the event of inability of the parties to agree upon such definitive contract, provisions were made for attempts to negotiate a settlement failing which the Government bound itself on termination to reimburse the contractor (1) for costs incurred in performance of the letter contract, (2) for amounts paid in settling obligations incurred, and (3) for expenditures and costs incurred in protecting Government property. The letter contract also provided for partial and advance payments, and for the Government to furnish equipment listed on an attached schedule totaling an estimated cost of $150,000.
18. The termination procedures described above were never utilized. Instead, the letter contract was superseded by a formal contract No. W33-038 ao-2023, dated April 17, 1944, the pertinent provisions of which read as follows:
Article 15. — Supplies to Toe Furnished — (a) The Contractor shall furnish and deliver to the Government the following articles and supplies:
Item 1. — Prints, being reproductions by means of the Gadi Process of certain mechanical drawings and Van- *188 dykes (hereinafter collectively referred to as “Van-dykes”). Said Vandykes shall be furnished by the Government, in the quantities set forth below, on or before midnight July 10, 1944. The above-mentioned prints shall be delivered by the Contractor in the quantities and at the prices set forth below:
Vandykes to be furnished by the Government Average square • feet of Vandykes Number of prints (inclusive) of each Vandyke Total square feet of prints Unit price per square foot of prints Total prices of prints
204,000 100-149 102,000,000 K012426 $1,267,452.00
68,000 150-299 20,400,000 .012105 246,942.00
68,000 300 and up 40,800,000 .011785 480,828.00
340,000 163,200,000 1,995,222.00
(b) The Government shall notify the contractor when Vandykes are ready. Within a reasonable time thereafter and at no additional cost to the Government the Contractor shall pick up the said Vandykes at Air Service Command, Patterson Field, Fairfield, Ohio. The unit prices listed above shall also include the transportation of said drawings to the plant of the Contractor;reproduction thereof by means of the Gadi Process; inspecting, counting, mechanically numbering, marking, folding, packing and labelling of the reproductions; and-delivery to f .o.b. point.
Article 16. — Delivery.—(a) The Contractor shall deliver each Government order for supplies to be furnished hereunder within twenty-one (21) days from the time the Vandykes are picked up at Air Service Command, Patterson Field, Fairfield, Ohio; provided, that the Government shall not require any such deliveries to exceed the maximum set forth in the following schedule:

Square feet

April_ 8,640, 000
May_ 21,360,000
June_ 69,920, 000
July_ 63, 280, 000
Total_ 163,200,000
% sí?
Article 34-.- — Secrecy.—(a) The Contractor agrees to be responsible in matters within its control for the safeguarding of all Secret, Confidential or Restricted matters that may be' disclosed or that may be developed in connection with the work under this contract * * *.
*189 Article 36. — Renegotiation.—(a) This contract shall be deemed to contain all the provisions required by subsection (b) of the Renegotiation Act, as amended by Section 701 of the Revenue Act of 1943 (Public Law No. 235, 78th Congress, enacted February 25,1944).
$ $ $ ‡ ‡
Article 39. — Revision of Entire Price by Negotiation — (a) Agreement to revise price. — The Government and the Contractor recognize that the costs of performing this contract cannot be accurately estimated at the time of its execution and that the contract price fixed in Article 15 may therefore be either too high or too low. They therefore agree that the contract prices shall be revised upward or downward in accordance with this Article on the basis of actual experience of the Contractor in producing forty per cent (40%) of the items under this contract (hereinafter called the “trial run”). They recognize that the costs of performing that part of the contract will not be typical for the remainder of the contract, but will provide sufficient information and experience to permit revision of the price.
*****
Article 40. — Government-Owned Facilities. — (a) In connection with its work under this contract, the Contractor shall, within the shortest practicable time, acquire or manufacture for the Government’s account the facilities listed in Schedule “A” attached hereto, the estimated costs of which are therein stated. * * *
(b) Upon inspection and acceptance of the facilities by the Contracting Officer, and upon the Contractor’s furnishing satisfactory evidence that it has made payment or incurred the costs as the case may be, the Government shall reimburse the Contractor for the actual costs of Schedule “A” facilities, approved by the Contracting Officer. * * *
*****
(e) (1) Title to each item of Schedule “A” facilities shall vest in the Government immediately upon inspection and acceptance thereof by the Contracting Officer, or at such earlier time as the Contracting Officer may designate in writing. Such facilities shall be deemed personal property although they may be affixed to realty.
(2) The Government hereby grants to the Contractor the right to use Schedule “A” facilities, without the payment of rental therefor, in connection with its work under this contract. * * *
*190 (1) If, upon the completion or termination of this contract or any other contract entered into between the Government and the Contractor for the performance of which the use of Schedule “A” facilities has been authorized, no notice pursuant to paragraph (k) of intention to remove an item has been received, the Contractor shall, at no expense to the Government in addition to the contract price, place the item in stand-by condition, and thereafter maintain it in such condition in its own plant for a period of ninety (90) days from the date of such completion or termination (unless a notice pursuant to paragraph (k) is received in the meantime). In lieu of placing the item in stand-by condition and maintaining it in its own plant, the Contractor may store the same elsewhere at its own expense provided that the item can be quickly and readily reinstalled in the production line and production resumed within a reasonable time if necessary in the interest of the Government.
The formal contract also contained typical printed provisions found in Government contracts such as clauses relating to changes, extras, inspections, delays-damages, disputes, termination at the option of the Government, and the like. It also provided for advance payments to plaintiff, not exceeding $598,566.60, and for reimbursement to plaintiff of its actual costs incurred in acquiring for the Government certain machinery and other equipment as provided in Article 40, supra.[8] By mutual agreement, the contract was subsequently amended through nineteen change orders and supplemental agreements which will be referred to below, as pertinent.
19. Very shortly after commencement of production under the contract, plaintiff experienced serious difficulties with respect to inspection standards established by defendant to govern the acceptability of finished Gadi prints. This resulted on several occasions in a complete stoppage of work in plaintiff’s plant and in the scrapping of thousands of square feet of rejected prints. These difficulties were not caused, or contributed to, by plaintiff; they were caused by defendant in two respects, namely, the furnishing by defend *191 ant to plaintiff of defective Vandykes for reproduction, and tbe imposition on plaintiff of unreasonable inspection standards. Following complaints by plaintiff, a thorough investigation of these conditions was made by defendants’s representatives as a result of which it was concluded that the existing inspection standards were unreasonable, particularly with regard to prints reproduced from defective van-dykes. In August 1944, the inspection standards were relaxed and inspection responsibilities were placed in the hands of different Government personnel who were acquainted with the technical requirements involved. As a result, plaintiff was able to salvage about $60,000 worth of scrapped rejects and to increase its deliveries of prints from about one million square feet per week to four million square feet per week. By October 31, 1944, its contract schedule was completely current. In recognition of the fact that the above described inspection difficulties could in no way be attributed to plaintiff, a contract negotiator for defendant offered to negotiate a contract amendment designed to reimburse plaintiff for the scrapped material. However, Mr. Jones stated that such an amendment would be unnecessary since he believed the contract prices, as best he could determine, would be sufficient to cover the loss. His judgment in this regard was borne out by the fact that for the year 1944, plaintiff made a profit on its operations under this contract of $127,868.91.
20. Meanwhile, a series of change orders to the contract had been negotiated and executed. As a result of these change orders, the obligation of the Government to furnish Vandykes on or before midnight July 10,1944, was extended to on or before midnight February 8,1945, and a change was made in the price applicable to small quantities of prints reproduced from Vandykes averaging 5 square feet in size.
21. By late November 1944, plaintiff was again experiencing difficulty in keeping its plant in operation. This was due to decreasing quantities of Vandykes being furnished to plaintiff, and it so notified defendant. Another investigation was thereupon instituted by defendant at plaintiff’s plant, culminating in a report by Resources Control Section, Materiel *192 Center, Army Air Forces, dated December 12, 1944, from which the following pertinent extracts are quoted:
% :Ji % # %
6. Considerable labor is now required on incoming Vandykes, due to the condition in which they are received. There is no list covering Vandyke numbers or sizes included with the shipment. Vandykes are badly curled, wrinkled, and folded when received, and they are all mixed up as to size. Also duplicateprints are quite common. This necessitates the Graphic Arts Inc., to straighten folds and wrinkles and retouch all defective prints preparatory to processing. * * * This additional work was not figured on at the time the contract was let.
7. Their original estimate was based on approximately 12 standard sizes of Vandykes. * * * Vandykes are coming to them in over Y5 different sizes which requires them to draw up 80 different plan sheets per day.* * * This additional work also was not figured on at the time the contract was let.
ij: Hi * #
14. Due to lack of Vandykes on hand, there were 187 employees idle on 7 December. Total Vandykes on hand would be completely processed by Saturday, 9 December, which would necessitate closing the plant for lack of work and would doubtless result m the loss of a great many of their skilled employees.

Conclusions:

1. Considerable labor savings resulting in reduced costs could be effected if Vandykes were supplied to Graphic Arts Company in proper condition and prepared for immediate processing.
4. A regular and uniform flow of Vandykes to Graphic Arts Company should be maintained.
*****
6. Both management and supervision are considered as very capable.

Recommendations:

1. It is recommended that immediate action be taken to provide Graphic Arts Company with work sufficient to maintain their present organization.
22. Shortly before the completion of the aforesaid report, the Chief of the Maintenance Data Section at Patterson Field became dissatisfied with the contract. On December *193 6, 1944, be requested termination of tbe contract on tbe ground that tbe previous backlog had been dissipated and that tbe current requirements for prints bad been reduced materially by changes in field conditions. On December 16, 1944, plaintiff wrote a letter to the defendant pointing out tbe various advantages of the Gadi process, as compared to blueprinting, and urged that tbe contract “be continued as long as the Army Air Force has need for reproductions of Engineer’s Drawings, or other reproductions where Gadi prints are suitable.” After investigation and discussion of the requested termination, the Procurement Division at Wright Field reported that Gadi prints were much cheaper than blueprints, that termination of the contract might result in the Government suffering a loss up to $500,000, that a blueprint backlog still existed, and that still other uses of the Gadi reproduction process might be feasible. Accordingly, the Procurement Division disapproved the request for termination and on December 18, 1944, advised the Maintenance Data Section at Patterson Field in part as follows:
After thorough consideration, it has been determined that the contract will not be terminated at this time, but will be modified, in some respects, and extended. It is understood that every effort will be made to find work which will help to whittle down the Government’s obligation under the contract and that the extended contract will be subject to termination at any time in the future, in the event that it becomes advisable to terminate it. It is understood that the representatives of the Maintenance Division, although prefering [sic] termination, acquiesce in the plan to continue with the contract for the time being.
23. In keeping with the expressed intention to modify the existing contract, defendant initiated procedures with a view to the execution of a supplemental agreement. Contracting Officer Taylor prepared a memorandum on December 19, 1944, requesting that a supplemental agreement be issued. His memorandum suggested changes in the existing contract which consisted essentially of a revision of the pricing schedule, a restriction on quantity of prints that might be ordered in any one week, an extension of the closing date *194 to June 30, 1945, and a revision of the price renegotiation article so as to call for a review of contract prices when 70 percent of the total contract price had been paid rather than 40 percent. He stated that this would provide a more satisfactory contractual arrangement and would serve “to extend the period of time that the Government may call for the services listed in Article 15 * * He then wrote to plaintiff on January 13, 1945, suggesting, among other tilings, that plaintiff plan to provide personnel and facilities sufficient for production of 500,000 to 1,000,000 square feet of prints per week until further notice. As a result of this advice, plaintiff was enabled to reduce the number of its employees to some extent.
24. Negotiations with respect to a supplemental agreement continued, and as of March 1,1945, Supplemental Agreement No. 5 was duly executed by the parties. The final supplemental agreement followed Lt. Taylor’s recommendations only to a limited extent. By its express terms, the supplemental agreement constituted a “Conversion of Contract to a Call Contract and an Open Contract.” It deleted Article 15 of the original contract and substituted therefor an Article 15A, reading in pertinent part as follows:
(a) The Contractor shall furnish and deliver to the Government the supplies and services described in Items 1 and 2 below at the prices set forth in Items 1 and 2 and in accordance with the requirements set forth below when and as the Contracting Officer may make calls therefor. The Contractor also shall furnish and deliver to the Government such supplies and services of the description. set forth in Item 3 below as the Government may make calls therefor. Quantities of the supplies and services to be furnished under Item 3 below and the prices and charges therefor, which prices and charges shall be fair and equitable, shall be determined as hereinafter provided. The period during which calls may be made under Items 1, 2 and 3 of this Article 15A began on 8 February 1945 and shall end at midnight 30 June 1945.
Item 1. — Prints (printed by means of the Gadi Process) of mechanical drawings and Vandykes furnished to the Contractor by the Government as provided in paragraph (b) below (said mechanical drawings and Van-dykes being hereinafter collectively referred to as Vandykes). The contractor shall be paid at the appli *195 cable unit price per square foot specified below, depending upon the number of prints of the particular Vandyke ordered to be printed at any particular time, for the aggregate square footage of said total number of prints:

Unit price per Humber of prints square foot

20 to 99, inclusive_$0.02186
100 to 149, inclusive_ . 012426
160 to 299, inclusive- . 012106
300 or more_ . 011785
He # ' ❖ ❖ ❖
Item 2. — Contractor shall arrange Vandykes into numerical sequence and shall list drawing numbers in numerical sequence on 8y2" x 11" sheets, single spaced, which sheets shall serve as check lists. In arranging the Vandykes in numerical sequence Contractor will eliminate any duplicate or obsolete Vandykes in each call prior to reproduction and will include in the check lists only those Vandykes which are to be reproduced under Item 1 above. The Government shall pay to Contractor for each 1000 drawing numbers listed on check sheets, or fraction thereof, a price of $45.19.
Item 3. — Such other supplies and services of the type now being furnished by the Contractor or of a type which the Contractor can produce by means of the Gadi Process as the Government may from time to time make calls for hereunder. The quantities of the supplies and services to be furnished and the prices and charges therefor, which prices and charges shall be fair and equitable, shall be determined as provided in paragraph (c) below.
* * * * * .
(f) As of the date of execution of this contract, there has been allotted for it the total sum of. $1,995,222.00. The Government shall place calls with Contractor by midnight 30 June 1945 for supplies and services under Items 1, 2 and 3 of this Article 15A the aggregate price of which when added to the aggregate price of supplies and services furnished pursuant to Article 15 hereof will equal $1,995,222.00 or such lesser sum to which the allotted funds of $1,995,222.00 may from time to time be reduced through operation of the provisions of paragraph (h) below. * * * Anything in this contract to the contrary notwithstanding, the Government shall not be obligated to pay to the Contractor any amount in excess of the sum allotted for this contract.
*196 (h) It is agreed between the Government and the contractor that, in the event that additional procurements are negotiated between the Government and the Contractor, each such additional procurement may, at the option of the Government, be added by supplemental agreement to this contract in which event Article 42 [providing for advance payments] shall be applicable to such additional procurement and the Government shall have the right to reduce the total funds then allotted to calls under Items 1, 2 and 3 of Article 15A in an amount, equal to the amount of the funds allotted to the additional procurement, or in any amount equal to a part of the funds allotted to the additional procurement, provided, however, that any reduction effected thereby shall not reduce such funds by an amount greater than the amount of unused funds allotted to calls under Items 1, 2 and 3 of this Article 15A, after deducting amounts sufficient to cover all calls theretofore made.
The delivery article was modified so as not to obligate the plaintiff to deliver more than 6,000,000 square feet of prints in any one week. After making other minor modifications, the supplemental agreement specifically deleted in its entirety the existing Article 39 providing for a revision of the contract price through negotiation.
25. Mr. Jones realized that Supplemental Agreement No. 5 was less advantageous to plaintiff than the original contract; and he therefore objected to it during negotiation conferences. Also, he was warned by a Government contract negotiator that by converting the original contract to a “call” or “requirements” type contract, and by eliminating the price redetermination provisions contained in Article 39 of the original contract, the Supplemental Agreement would have the effect of reducing plaintiff’s existing contractual rights.
Throughout his testimony in the trial of this case, Mr. Jones consistently asserted that defendant’s contract representatives assured him verbally on several occasions that plaintiff would not be allowed to suffer losses in its Gadi Division and that the contract would be formally amended to reflect these assurances. As stated in finding 14, assurances of efforts to protect plaintiff against losses were given Mr. Jones. They played a direct part in his willingness to allow plaintiff to become a prime contractor on this job. On *197 tlie other hand, the defendant’s contract negotiators believed that these assurances were entirely fulfilled by Article 39 of the contract providing for price redetermination after a “trial run” performance. As stated, this protective provision was entirely eliminated from the contract by Supplemental Agreement No. 5. Mr. Jones agreed to this amendment although he was warned against it and was by then aware that the entire contract obligation had become a highly controversial matter within the Air Force and that serious consideration had even been given to instituting termination procedures. He stated that he signed it because of statements made to him by Lt. Taylor and a representative of the Air Force legal department that the basic intent of the original contract remained unchanged, and that the Government’s total requirements and needs were still the same but that the Government desired both the flexibility of a call contract due to week-to-week fluctuations in the amount of prints required at any given time and the right to order Gadi reproductions of items other than mechanical drawings not in excess of the original contract price.
26. Supplemental Agreement No. 15 was added to the contract by mutual agreement as of October 2, 1945. It extended the period within which calls might be made by defendant for prints, Vandyke check lists, and drawing books through December 31, 1945, and further provided a like extension of the 90-day “stand-by” period contained in Article 40 of the contract requiring certain maintenance by plaintiff of Government-furnished facilities following contract completion. The supplemental agreement also increased the price payable for prints and check lists. Previous supplemental agreements had added to the contract various items for reproduction by plaintiff other than mechanical drawings, such as printed drawing books and paper targets. On December 18, 1945, plaintiff wrote a letter to defendant referring to the extension period provided by Supplemental Agreement No. 15, protesting once more the small amount of work being called for by defendant, and inquiring as to the possibility of rental or sale to plaintiff of that portion of the Government-owned equipment deemed suitable for civilian use. The letter concluded:
*198 We understand that an extension of our call contract for another 90 days is now going through and that there is also some other needs for our services at Wright Field. It is our desire to continue to serve the Government whenever possible.
Due to the fact that the Government has supplied us with only a small amount of material to process, we have this year sustained a substantial loss. We do not contemplate filing claim for this loss but would _ like to have this taken into consideration in regard to either rental or sale of the machinery and equipment if it can be arranged.
' ❖ * * *
27. The anticipated additional 90-day extension was effected by Change Order No. 17 which extended the call period for the last time through March 31, 1946. Thus, through change orders, the original contract completion date of July 31, 1944, was finally extended to March 31, 1946, and some final work was performed as late as May 1946. The defendant did not furnish 340,000 Vandykes to plaintiff for reproduction by the Gadi process “on or before midnight July 10, 1944,” as required by the original contract. The record supports the assertion of Mr. Jones that, if the 340,000 Vandykes had been furnished by defendant as originally agreed, the plaintiff would have been able to complete the entire contract by July 31, 1944. The several extensions of time were not requested by plaintiff but were for the convenience of the Government. Mr. Jones agreed to these extensions on behalf of plaintiff because of his desire, evidenced throughout the contract period, to cooperate with defendant, and because of assurances given him that the volume of Vandykes furnished plaintiff in the future would be greatly increased. There was, in fact, a substantial increase in the number of Vandykes furnished to plaintiff by defendant in the months following July 1944. Prior to July 10, 1944, defendant furnished plaintiff 73,858 van-dykes from which plaintiff produced 22,333,781 Gadi prints. From July 10, 1944, to the last Gadi delivery date in November 1945, defendant furnished plaintiff 256,136 Vandykes from which plaintiff produced 40,871,910 Gadi prints.
28. A summary of defendant’s payments to plaintiff under the original contract and amendments thereto is as follows:
*199 For Gadi prints totaling 124,301,178 square feet $1, 668,.846.64
For numbering of mechanical drawings in sequence- 14,576.30
For reproductions of drawing books, training devices, and contracts_ 196,922.65
For reimbursement to plaintiff by defendant of equipment and machinery costs_ ■ 148, 839. 85
Total receipts___ [1]2, 029,185.29
29. In June 1946 plaintiff commenced correspondence with defendant for the purpose of obtaining either payment for maintaining guards and other security precautions at its Gadi plant or permission of the Air Force Intelligence Division to abandon the security system. The then contracting officer wrote plaintiff that, due to expiration of the contract, an amendment deleting the security clause was impossible. Whereupon plaintiff wrote the Intelligence Division on July 16, 1946, and advised it that, unless instructed to the contrary, the guards and security system would be discontinued by plaintiff as of July 22, 1946. No contrary instructions were received by plaintiff, and it, therefore, discontinued the security system as stated.
30. In the latter part of January 1944, plaintiff had- offered, subject to Government contract, to purchase for $112,-500 the six-story warehouse-type building at 110 Ottawa Street, Toledo, Ohio, as to which it had taken a 90-day option on October 13,1944. Finding 12, supra. The offer was accepted and the sale consummated. Plaintiff had no need for such a large building in its regular commercial operations. It was purchased solely for the purpose of providing adequate space within which to perform the large-scale reproduction operation contemplated by the instant contract. Extensive renovation and repairs were necessary to put the building in proper condition for the contract operation. The renovation plans and repairs were approved by defendant, paid for by plaintiff, and made the subject of a certificate of necessity, permitting plaintiff to deduct the costs thereof for tax purposes over the life of the contract. Full deduction of those costs was actually accomplished over a period of 17 months. Sometime in 1947, plaintiff moved its regular com *200 mercial business and plant from rented quarters[9] in the business district of Toledo to its building at 110 Ottawa Street.[10] It thereafter carried on its business at the latter address until September 29, 1958, on which date plaintiff concluded a sale of its business and equipment to a corporation controlled by former employees of plaintiff. At the same time, plaintiff leased its building at 110 Ottawa Street for a period of 5 years (with a 5-year renewal privilege) to its said former employees’ corporation at an annual rental of $90,000. Plaintiff here claims for the first time that it has suffered damages from the acquisition of this building in the amount of $312,000, asserting that the building has been, and is, a liability to plaintiff. These allegations are not borne out by the record. The total verified costs incurred by plaintiff in purchasing and reconditioning the building for the performance of this contract amounted to $304,276.41. Of this amount, plaintiff was permitted under certificate of necessity to write off for tax purposes over a 17-month period the sum of $157,051.72. The present market value of the land and building, without giving any effect to the advantageous lease described above, is approximately $130,500. In addition, by making use of its own building, plaintiff has been freed of a considerable amount of rental expense.
31. Also, plaintiff here claims for the first time that it is entitled, under an implied contract theory, to be paid for expenses incurred and services rendered prior to the contract, as follows:
(a) Actual costs in developing and perfecting Gadi process -$30, 000
(b) Value of experience, skill, and creative talent in developing and perfecting the Gadi process_ 200, 000
(c) Expenses and services in acquiring a building, machinery, and equipment, and in setting up the Gadi plant- 10,000
Total_ 240,000
Of the amount claimed in item (a) above, plaintiff’s books and records substantiate actual expenditures of $2,247.11 *201 in developing the Gadi process. Of the amount claimed in item (c), plaintiff’s books and records substantiate actual expenditures allocable to that claim of $50. The remainder of the claims in items (a) and (c) consists of rough and doubtful estimates of employee time, travel, and telephone expense, and arbitrary overhead allocation, all of which are deemed unproved.
The amount claimed in item (b) is an arbitrary figure which is apparently based upon a theory that plaintiff should equitably participate in some of the savings realized by defendant in using the Gadi process instead of more expensive blueprinting. Defendant did not purchase the Gadi process, and in fact refused several offers by Mr. Jones to give it to the Government as plaintiff’s contribution to the war effort. Mr. Jones was aware that no funds from defendant were available for his research at the time that he volunteered to undertake the project. Major Guyer made no promises of reimbursement or remuneration for the research and development work. The most that was promised Mr. Jones in this connection was the later negotiation with plaintiff of a contract or purchase order.
32. Plaintiff: has estimated that its profit before taxes would have been $616,048.31 if the original completion date of the contract had not been changed by the parties, and based on a breach of contract theory, it claims the approximate sum of $250,000 on account of alleged loss of profits.[11] The estimated profit of $616,048.31 approximates one-third of gross sales and is an unreasonable estimate. A more reasonable profit estimate is contained in plaintiff’s cost estimates set forth in Article 30(b). of the contract establishing a profit rate of approximately 9 percent, or a total estimated profit of $181,294.80. A summary of plaintiff’s actual net profit experience for a’4-year period ended December 31, *202 1946, including a separate statement of the Gadi Division, is as follows (loss figures in parentheses) :
Year Gadi division profit before taxes Combined profit before taxes Adjusted combined net profit after taxes
1943. $60,986.14 $24,827.14
1944. $127,868.91 419,593.76 113,869.46
1946-[1](133,958.71) 98,917.63 26,959.79
1946. (98,980.05) (9,149.32) (2,959.65)
(105,069.85) 560,348.20 162,696.74
33. Plaintiff sustained an operating loss in its Gadi Division of $67,952.31 for the period January 1, 1946 through May 31, 1946. This loss is one of two claims presented by plaintiff to the Congress, as stated in finding 3, supra, which was approved for payment by Congress but vetoed by the President. By its amended terms, the contract expired on March 31, 1946, but plaintiff continued to perform a small amount of work for defendant until the latter part of May 1946. Plaintiff quoted prices for Gadi reproductions to the Air Force in August 1946 and on January 30, 1947, Mr. Jones wrote the Commanding General, AAF, as follows:
As you already know the Gadi Division of the Graphic Arts Corporation of Ohio was originally set up to handle reproductions of engineer’s drawings for the Army Air Forces with facilities furnished by the Army Air Forces and some equipment belonging to our company. The facilities belonging to the Army Air Forces are being held by us under a lease arrangement. However, since no great amount of material for processing has been furnished to our company in recent months it becomes imperative that- we close down the operations of the Gadi Division as of March 31,1947 arid we are planning to release these government-owned facilities.
We desire to ascertain whether or not the Army Air Forces, have any plans or contemplate furnishing us with sizable quantities bf materials for feproduction. If there are no foreseeable requirements we will close down our Gadi Division except for certain items of machinery that will be retained together with equipment *203 owned by onr company which will permit ns to make possible to the Army Air Forces the use of the Gadi Process on a small scale.
A prompt reply in regard to this matter will be appreciated.
On March 5, 1947, the Air Materiel Command Headquarters responded as follows:
In reply to your letter, EEJ/ar, dated 30 January 1947, the distribution of engineering drawings by the Engineering Division of the Air Materiel Command to the Army Air Forces and associated activities has at this time been reduced- to a scale that does not justify reproduction by Gadi Process. Therefore, under present operating conditions the Engineering Division of the Air Materiel Command does not contemplate furnishing your company with any sizable quantities of material for reproduction.
It is desired, however, to point out that in the event an emergency makes necessary a greatly increased need for reproduction of engineering drawings under present known methods, the Gadi Process of reproduction will again be of great value to the Army Air Forces.
Following this exchange of correspondence, arrangements wore made and quickly consummated for the removal of Government-owned machinery and equipment from plaintiff’s plant. See finding 36, infra.
34. Plaintiff’s other claim which was presented to and approved by Congress (but vetoed by the President) involves uffused and surplus inventory of materials on hand at the conclusion of the contract. The verified amount of such inventory is $14,085.68. Of this amount $5,965.32 pertains to specialized Gadi materials, i.e. Gadi blue ink and plastolith plates.
Plaintiff also claims the sum of $2,285.19 which is the value of specialized Gadi chemicals held for plaintiff’s account by the French Paper Co. at the conclusion of the contract. On April 10, 1946, French Paper Co. appealed to plaintiff “to help us recover this loss.” Plaintiff has not paid this amount, nor has it been billed for it. If reimbursed by defendant, plaintiff feels a moral responsibility to pay the amount to French Paper Co. Therefore, plaintiff’s claim for *204 unused and surplus inventory amounts to $14,085.68 plus $2,285.19, or a total of $16,370.87.
Mr. Jones was assured by the contracting officer and the contract negotiator that, on completion of the contract, plaintiff would be reimbursed by defendant for the cost of any specialized Gadi materials on hand. The original contract contained no specific provision in this regard.
35. The surplus supplies referred to in the preceding finding have been stored by plaintiff since June 1, 1946. It claims reimbursement for storage charges for the period June 1, 1946 to October 31, 1958, in the estimated sum of $3,480, and alleges that these charges are continuing. The plaintiff has asserted this storage claim for the first time in this suit, although it is based upon the theory that the stored material is Government-owned property. The defendant does not now have, nor has it ever had, title to this property.
36. Pursuant to Article 40 of the contract, plaintiff has asserted, for the first time in this suit, a claim of $15,168 for expenses of placing and maintaining Government-owned equipment and machinery in storage. The claim is estimated and not subject to verification.
This claim is based on plaintiff’s contention that the 90-day “stand-by” period provided for in Article 40,'as amended, expired on December 31, 1945. However, commencing in the latter month, protracted negotiations took place between the parties regarding a sale or rental to plaintiff of this equipment and machinery. On February ÍÍ, 1947, the Detroit Procurement Field Office of the AAF wrote plaintiff in part as follows:
Under date of 18 November 1946, this office foi'warded you three (3) numbers of proposed lease contract. * * *
* * * * *
This office is in receipt of your letter dated 30 January 1947, stating that certain equipment mentioned in the proposed lease will no longer be required by your organization after 31 March 1947. This office will take the necessary steps to remove such equipment from, your premises, but in order to do so properly, it will be necessary that the lease covering such items be immediately executed and returned to this office together with your check for the rental. An adjustment in the rental will be made after the removal of said item.
*205 On April 11, 1947, plaintiff wrote the aforesaid office, as follows:
As stated in onr communication of March 25,1947, there are a number of factors that have altered our production planning and changed our program of operations. The matter of leasing the government facilities has been carefully considered but in view of the facts previously outlined we do not desire to enter into a lease agreement for these facilities and it is our wish that they be removed from our plant.
Your attention in expediting the removal of this equipment as soon as possible will be greatly appreciated.
Thereafter, on May 19, 1947, defendant furnished plaintiff with detailed packing and shipping instructions for the machinery and equipment remaining in plaintiff’s possession.
37. Plaintiff is the sole owner of the claims asserted herein and has made no assignment or transfer thereof.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and it is therefore adjudged and ordered that it recover of and from the United States on Count I of its petition the sum of sixteen thousand three hundred and seventy dollars and eighty-seven cents ($16,370.87), and on Count II of its petition the sum of sixty-seven thousand nine hundred fifty-two dollars and thirty-one cents ($67,952.31). As to all other claims or counts of plaintiff, its petition is dismissed.

Private Law 665, ch. 322, 70 Stat. A73.

 Plaintiff also alleges that during 1945 it suffered losses amounting to $133,958.71 in maintaining the Gadi process division but states that such loss is not claimed in this suit for the reason that such loss was set off in a renegotiation proceeding against plaintiff’s profits from another Government contract, under its breach of contract theory, plaintiff also alleges in the alternative that the sum stated in finding 2(b) represents its damages suffered due to a breach of contract by defendant.

 Plaintiff also alleges that during 1945 it suffered losses amounting to $133,958.71 in maintaining the Gadi process division but states that such loss is not claimed in this suit for the reason that such loss was set off in a renegotiation proceeding against plaintiff’s profits from another Government contract. under its breach of contract theory, plaintiff also alleges in the alternative that the sum stated in finding 2(b) represents its damages suffered due to a breach of contract by defendant.

 Subsequently, plaintiff was able to dispose of a portion of such materials in the amount of $5,782.81, thus reducing its claim in this regard to $16,406.88.

 The name GADI -was derired from the initials of Graphic Arts (GA) and a contraction of the word “diagram” (DI). It is a registered! mark.

 Some six years after the events involved herein, U.S. Patent No. 2,550,326 rvas granted to one Clarence A. Brown as assignor to Jones Graphic Products Company, which patent covered the invention of a paper printing, plate bearing resemblance to the Gadi paper plate but making use of metal foil and different chemicals in its structure.

 Plaintiff’s check for $500 was delivered as a deposit at this time to an agent for the seller of the building. However, this check was never cashed but was returned to plaintiff on January 17, 1944, when plaintiff contracted to buy the building, “subject to Government contract.” See finding 30, infra.

 This time was extended by amendments to June 1, 1944.

 Advance payments totaling $598,500 were made to plaintiff by defendant In May and June 1944, and were recouped by defendant In the course of subsequent payments under the contract. In May 1945,. defendant reimbursed plaintiff its costs in acquiring the machinery and equipment in the total amount of $148,839.85.

 The discrepancy of 15 cents represents a discount adjustment.

 The annual rental on these premises amounted to $3,960.50.

 Plaintiff makes no claim herein for may expense or inconvenience attendant upon such moving of its business.

 As stated previously, the completion date of this contract was finally extended through several amendments from July 81, 1944 to March 31, 1946. Also, it has been found that these extensions, although mutually agreed to, were for the convenience of defendant, since it may fairly be concluded from the record that plaintiff could have completed the contract within the original period if it had been furnished by the defendant the required number of Vandykes assuming they were in proper condition for reproduction. (See finding No. 27.)

 This loss was considered by The Renegotiation Board in renegotiating plaintiff for the year 1945 and was set off against profits earned by plaintiff under contracts with the Army Map Service,