Micheal **CHERNICK** and Belle Chernick

v.

The **UNITED STATES.**

No. 222–64.

United States Court of Claims.

Feb. 17, 1967.

Marion Edwyn Harrison, Washington, D. C., attorney of record, for plaintiffs. Reeves, Harrison, Sams & Revercomb, Washington, D. C., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is an action to recover the difference between the rentals which have been paid to plaintiffs as lessors pursuant to a lease of realty to the Government, and the amounts which they claim would have been payable if plaintiffs' bid had accurately reflected their intent. They also pray for such other and further relief as may be appropriate.

In January 1961 the Post Office Department issued its invitation and advertisement for bids to furnish leased space in a postal facility which the successful bidder was to construct in Sioux City, Iowa, on a site which the Department was then in the process of acquiring by a condemnation action and which the successful bidder was thereafter to purchase from the Department. The invitation and/or advertisement advised prospective bidders that:

> (1) The Post Office Department had instituted eminent domain proceedings to acquire the site upon

---

* Although we have disagreed with the result he reached, the court acknowledges the assistance it has derived from the opinion and findings of fact of Commissioner Richard Arens. We have borrowed portions of his opinion and adopted all but one of his findings of fact.

which the building and improvements would be located, and had deposited into the registry of the court the sum of $180,000 upon the filing of the declaration of taking as the estimated just compensation, but that the court may award compensation for the taking exceeding the above sum;

(2) The Government had incurred other acquisition costs of $3,249, making a total site acquisition cost as of that time of $183,249;

(3) The successful bidder must reimburse the Department for the above site acquisition cost, and reimburse the Department for any additional amounts it may pay in order to complete site acquisition;

(4) Bids must be made on a form, prepared by defendant, entitled "Agreement to Lease" and be submitted for a basic lease term of 20 years, with certain renewal options;

(5) Bids must include a grant to the United States of an irrevocable option to purchase the fee simple title to the premises; and

(6) The award would be made to the responsible bidder whose bid was most advantageous to the Government, price and other factors considered, and that in determining price, the Department would allow the greater weight to the rental specified during the basic 20-year lease term.

The Agreement to Lease form contained blank spaces for bidders to fill in dollar amounts for the per annum 20-year lease term and renewal options, with both lessor maintenance and with Government maintenance of the premises. Paragraph 5 of the Agreement to Lease form provided:

There has been included in the rental stipulated above, for the basic 20-year lease term, the basic amount of the site acquisition cost, being $183,249.00. If the said site cost exceeds the said total amount, then the annual rental during the basic 20-year term shall be increased by ——————— (  ) per cent of the additional cost of the site acquisition. If the said site cost is less than the said total amount, then the annual rental during the basic 20-year term shall be reduced by ——————— (  ) per cent of the decreased cost.

In April 1961 plaintiffs' agents, who had extensive experience in estimating on post office lease facilities, but who had never before prepared an estimate involving a percentage increase or decrease in rental depending upon an increase or decrease of site acquisition cost, prepared plaintiffs' bid. The evidence establishes that, although plaintiffs inserted in paragraph 5 of the Agreement to Lease 8/10s of 1% for the increase in annual rental and 7/10s of 1% for the decrease of annual rental (depending on the increase or decrease of cost of site acquisition), they intended to insert 8% for the increase and 7% for the decrease. The difference was due to a mathematical or typographical error. The evidence does not establish which it was.

The day after plaintiffs submitted their bid, they requested that it be returned unopened and it was accordingly returned to them. About 2 weeks later plaintiffs resubmitted their bid. In the interim they had opened the bid but did not go over the figures. Shortly thereafter plaintiffs were invited to discuss their bid with postal officials who told them that if they would adjust the renewal option figures in their bid downward they would be awarded the contract. No mention was made in the discussion concerning percentage of increase or decrease in rental depending on site acquisition costs. Subsequently, plaintiffs did adjust the renewal option figures in their bid downward.

At the time plaintiffs submitted their bid, as well as at the time the bids were considered by defendant, it was not known what the ultimate total site acquisition costs would be.

Plaintiffs' bid was one of eight submitted on the postal facility. In an analysis prepared by an analyst in the

Post Office Department, plaintiffs' bid of $60,550 for the 20-year basic rent with lessor maintenance was found to be the lowest, although certain of plaintiffs' bids on renewal options were found to be high. The analyst expressed the opinion that plaintiffs' bid for the 20-year basic rent with lessor maintenance represented a fair and reasonable rent, and recommended it. The analysis noted that "any site cost in excess of above [$183,-249] shall cause basic rental to be increased by 9/10's of 1% of such excess." The analysis was approved by the Director of Real Estate Leasing, the Acting Director of Real Estate, and the Assistant Postmaster General who was the contracting officer. The bids of the other bidders on the 20-year basic rent with lessor maintenance ranged from $67,500 to $90,500; on percentage increase in rent upon increase of site acquisition cost, they ranged from 6% to 10% of the increased cost; and on decrease in rent upon decrease of site acquisition cost, they ranged from 5% to 7% of the decreased cost.

In June 1961 defendant accepted plaintiffs' bid and by July 1962 the postal facility was completed and occupancy delivered to defendant. Shortly thereafter the parties executed a formal lease which incorporated by reference the terms and conditions of plaintiffs' bid and defendant's acceptance. A few days later defendant wrote plaintiffs that the rental had been adjusted to reflect additional site acquisition costs incurred in the sum of $4,047.50 and requested payment therefor, and advised that the Post Office Department had incurred further additional site costs of $45,899.12, but that payment of that amount and the rental adjustment would be held in abeyance since the court action was still pending on the condemnation proceedings and it was possible that that amount might be reduced. Plaintiffs then telegraphed defendant that the provisions of the lease on added costs of site acquisition contained a typographical error and that the additional costs should be amortized at the same 8% rate as the principal

amounts. This appears to be the first time that plaintiffs discovered the mistake in their bid, or that defendant knew that plaintiffs claimed that they had made such a mistake.

After the court action in the condemnation proceeding became final, plaintiffs paid to defendant, under protest, the additional site acquisition costs, and defendant has paid rental on an annual rate based on plaintiffs' bid of $60,550 for the basic rent, plus 9/10s of 1% of the total increased site acquisition cost. The difference between the rental which plaintiffs claim and the rental which defendant pays is approximately $3,600 annually.

█ We are of the opinion that under the circumstances, the contracting officer, if he did not know, should have known that the bid was erroneous. It is common knowledge that the most ordinary kind of arithmetical or clerical mistake involves the misplacing of a decimal. Any instance of a monetary figure one-tenth or ten times what it might naturally be expected to be, is a warning flag. 17 Comp.Gen. 339 (1937). See Ramey & Erlewine, Mistakes and Bailouts of Suppliers under Government Contracts, 39 Cornell L.Q. 634, 654 (1954). Here, if plaintiffs' bid figure for the contingency of the site acquisition cost exceeding the estimate were multiplied by ten, it would fall squarely within the range of the other bidders' figures, none of which were below six or over ten percent. The bid as submitted could not, in the 20-year period, have compensated plaintiff in full or major part for any cost of site acquisition over the base figure. Counsel in oral argument surmised (perhaps facetiously) that the mistake would probably have been discovered in any other month but June, the month, as old government hands know, of the fiscal year-end rush to obligate appropriated funds before their lapse. Whether this is so or not, we cannot, for obvious reasons of public policy, recognize the existence of a lower standard of care for contracting officers in June, than in other months.

■ In Wender Presses, Inc. v. United States, 343 F.2d 961, 170 Ct.Cl. 483 (1965), are collected and collated a number of leading cases on mistakes in bids. Insofar as the legal principles stated in *Wender Presses, Inc.*, supra, and the cases cited therein are applicable to the factual situation in the instant case, plaintiffs may recover only if defendant's responsible officials knew or should have known of the mistake at the time the bid was accepted. The test of what an official in charge of accepting bids "should" have known must be that of reasonableness, i. e., whether under the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer; among such factors are obvious wide range of bids, and gross disparity between the price bid and the value of the article which was the subject of the bid. The plaintiffs' case here meets this test.

■ Defendant suggests that the *Wender Presses, Inc.*, supra, test should be applied to the contractor's bid with respect to all items of the bid in the aggregate, and if, over-all, the bid is not so widely different from other bids, then there is nothing reasonably to raise the presumption of error in the mind of the contracting officer. This we do not agree to. The purpose of breaking up a bid into contingency items, absent other stated purpose, would appear to be to enable the contracting officer to evaluate and more accurately separate the bidder's proposals with respect to the contingencies provided for. This would include facilitating detection of errors whether reflected in bids that were too great for particular items, or too small. The contracting officer here, as the record shows, did advert to the fact that, as he supposed, the bid figures for certain options were too large. He can hardly urge, therefore, that he was not required to notice the more obvious fact that bid figures for other items were too small, or that errors in particular clauses were details too petty for his notice.

■■ Since the contracting officer should have discovered the error he should also have warned the contractor before making the award, and requested verification. 36 Comp.Gen. 585 (1957). See Alabama Shirt & Trouser Co. v. United States, 121 Ct.Cl. 313, 331 (1952). There is authority that a mere general request for verification would not suffice; it should invite attention to the reason for surmising error. In United States v. Metro Novelty Mfg. Co., 125 F. Supp. 713 (S.D.N.Y.1954), the contracting officer made his request in the general terms then considered sufficient and the contractor did review his bid but failed to detect his error, and instead "confirmed" his bid. The court held the reaffirmation "does not bar the defense of recision," p. 714. Doke, Mistakes in Government Contracts—Error Detection Duty of Contracting Officers, 18 Southwestern L.J. 1, 30 (1964), discusses this case with high approval, furnishes unreported factual details from the court records, and states that in various unpublished decisions the Comptroller General has followed it. One such, however, is now published: 44 Comp.Gen. 383, 386 (1965).

■ *A fortiori* here, the plaintiffs' request for the return of their bid unopened, and their holding of it for two weeks without checking the figures, in no way exonerated the contracting officer from performing this duty. He had said and done nothing to enable them to avoid the morass in which they were about to plunge, and had no right to suppose that they were using the time taken for that purpose.

■ The plaintiffs discovered their mistake too late for recision to appeal as a feasible remedy. The eggs could not be unscrambled. To hold they are restricted to recision now would be contrary to public policy because it would throw the performance of government contracts into frustration and chaos on any late discovery of an error in a bid. They ask an upward adjustment of the rental to correspond to the bid we have found they intended to make. This court

has allowed such an adjustment in a case when the mistake was apparent on the face of the bid. Shepard v. United States, 95 Ct.Cl. 407 (1942). It considers that it has equitable jurisdiction to reform government contracts through grant of price increases to contractors. Jones & Sears, Inc. v. United States, 158 Ct.Cl. 162 (1962). However, the degree of proof demanded is higher than in the case of recision. Welch, Mistakes in Bids, 18 Federal B.J. 75, 80, 82 (1958).

> And when a bidder has made an error in its bid price and the contracting officer has reason to know of the error, but took advantage of it, and the bidder performed in accordance with the award, the price will be corrected upon presentation of evidence clearly and convincingly establishing what the price would have been but for the error. (37 Comp.Gen. 706, 707 (1958)).

In an earlier decision the GAO demanded the original work sheets used in preparing the mistaken bid to show how the mistake was made and the exact amount that would have been bid, absent the mistake. 17 Comp.Gen. 416, 418 (1937). However, in 38 Comp.Gen. 504 (1959), it made a *quantum meruit* adjustment. In 36 Comp.Gen. 585 (1957), contractor made a bid intending to supply ham in 4 ounce packages when 6 ounce packages were called for. Since the contracting officer should have noticed the mistake, relief was granted, although the published opinion shows it was determined what the bid would have been for 6 ounce packages, by conjecture mostly.

In this court it would seem the increased price could not exceed the next lowest bid. Shepard v. United States, supra. But Doke, supra, suggests at p. 43 that the next lowest bid should not establish a ceiling on the damages, but the measure of them.

Here the findings establish what the bid was intended to be, but we do not know that the rental in the involved contingency, if correctly bid, would not have been negotiated downward, especially if it exceeded other bidders' figures for the same contingency. The bid figures for some options were so negotiated. This court should be reluctant to compare the bid as an entirety with other bids, because it would involve the exercise of administrative discretion as to which proposal taken as a whole, with all its contingencies and options, was most advantageous to the Government. But there is no difficulty in ascertaining the next lowest bid figure solely on the contingency the plaintiffs' mistaken 6/10s of 1% figure related to—it was 6%. This is 3/4 of the 8% plaintiffs intended to bid, and if it is permissible to conjecture, probably not above any reduction that negotiation might have achieved. Conjecture or not, 6% of any additional site acquisition cost, to be added to the basic rental, is as Doke, supra, suggests, a fair and reasonable provision for the contingency involved, and we therefore hold that it is the relief the plaintiffs are entitled to. We believe it is in accord with the authority referred to. The modern GAO decisions that are available seem to reflect an increasing reluctance to deny reformation, if sought, once it is determined that the contracting officer committed a breach of duty in not calling the bidder's attention to a manifest mistake. This liberal attitude has our approval, and we believe it is even the more economical in the long run.

The commissioner made certain findings of fact which the parties acquiesced in, except that plaintiffs excepted to finding 4(g) which read as follows:

> There is no evidence that defendant knew, prior to July 24, 1962 (finding 11(b), infra *), that plaintiffs made a mistake in their bid.

Plaintiff excepted to the refusal of the commissioner to make certain other findings that plaintiff requested, but in view of the court's action on finding 4

---

* (b) On July 24, 1962, plaintiffs telegraphed to defendant that the provisions in the lease on added costs of site acquisition contained a typographical error and that

the additional costs should be amortized at the same 8% rate as the principal amounts.

(g) we believe such requested findings would, if made, be superfluous, and therefore do not make them. Except for finding 4(g), which we revise, we adopt the commissioner's findings as the findings of the court.

Plaintiffs are entitled to recover judgment at the annual rate of 6% of the additional site acquisition cost for each annual rental period for which rent was due from July 10, 1962 to this date, with credit for ⁹⁄₁₀s of 1% of the additional site acquisition cost, if paid, for each such period. Unless the parties stipulate the amount to be recovered accordingly the case will be ordered returned to the commissioner for computation of the amount of judgment to be entered.