**BROMLEY CONTRACTING CO., INC.**

v.

**The UNITED STATES.**

**No. 5–76.**

United States Court of Claims.

March 21, 1979.

Martin J. Cohen, New York City, attorney of record for plaintiff.

Lynn J. Bush, Washington D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exception to the recommended decision of Trial Judge Joseph V. Colaianni, filed July 24, 1978, pursuant to Rule 134(h). The claim, as upheld by Trial Judge Colaianni, is for reformation of a contract for building reconstruction to correct a mistaken bid. Defendant before us has abandoned its opposition to the claim except as it asserts a right to interest on the sum awarded. After consideration of briefs and oral argument of counsel, this court agrees with the trial judge's recommended decision as set forth below, and affirms and adopts it as the basis for its judgment in this case. The court also adopts the trial judge's separate findings of fact as its own, which are set forth in his recommended decision and are not printed here as such facts necessary to the decision are contained in his opinion.

The only aspect of the trial judge's opinion to which plaintiff excepted was his omission of interest on the recommended judgment for plaintiff. Plaintiff seeks interest payments from the date of completion of the contract to the date of payment of the claim.

■ We agree with the trial judge's recommended decision, and do not allow recovery of interest. Plaintiff bases its interest claim on the contract clause incorporated under ASPR 7–104.82, 32 C.F.R. § 7–104.82, for payment of interest on contractors' claims. That provision reads in part:

(a) If an appeal is filed by the Contractor from a final decision of the Contracting Officer *under the DISPUTES clause of this contract*, denying a claim *arising under the contract*, simple interest on the amount of the claim finally determined owed by the Government shall be payable to the Contractor. Such interest shall be at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41; 85 STAT. 97 for the Renegotiation Board, from the date the Contractor furnishes to the Contracting Officer *his written appeal pursuant to the DISPUTES clause of this contract*, to the date of (i) a final judgment by a court of competent jurisdiction, or (ii) mailing to the Contractor of a supplemental agreement for execution either confirming completed negotiations between the parties or carrying out a decision of a Board of Contract Appeals. [Emphasis supplied.]

However, that provision does not govern the instant case, as it applies to appeals from a decision of the contracting officer made under the disputes clause of the contract. ASPR 2–406, 32 C.F.R. § 2–406, authorized correction of mistaken bids by the contracting officer. When, as here, he refused to correct a mistaken bid, the case went from the contracting officer to the General Accounting Office for resolution, and Boards of Contract Appeals did not have disputes clause jurisdiction. Plaintiff did not appeal to such a board here. Thus, plaintiff did not utilize the disputes clause or any of its accompanying administrative procedures. Procedures that will apply under the Contract Disputes Act of 1978, Pub. L.No. 95–563, are not relevant in this case.

■ Plaintiff argues that ASPR 7–104.82, 32 C.F.R. § 7–104.82, was meant to authorize a general allowance of interest to contractors in disputes where they were ultimately determined to be entitled to damages, and cites a footnote in *Framlau Corp. v. United States*, 568 F.2d 687, 694, 215 Ct.Cl. 185, 198 n. 16 (1977) for that proposition. But the footnote in *Framlau* does not alter the requirement of the contract language that claims *arise under the contract*, and it cannot be interpreted to expand allowance of interest for claims arising outside, not under, the contract, and which are not settled via a disputes clause. As an allowance of interest would require an explicit waiver of sovereign immunity, such interest may be awarded only if a specific provision for payment exists in a statute or the contract. *United States v. Mescalero Apache Tribe*, 518 F.2d 1309, 1314–17, 207 Ct.Cl. 369, 378–89 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). This rule has been codified in 28 U.S.C. § 2516(a) which provides that:

§ 2516. Interest on claims and judgments

(a) Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof.

No express provision for the award of interest applied to cases of equitable reformation of contracts to correct mistaken bids. Existing interest provisions of contracts of statutes cannot be enlarged by implication or analogy without doing violence to the doctrine of strict construction of the consent to be sued. This case will not be a precedent for future cases governed by Pub.L.No. 95–563, the Contract Disputes Act of 1978.

Therefore, we cannot allow recovery of interest for plaintiff. Judgment is entered for the plaintiff in the amount of $76,505, the sum found to be the difference between the reformed price and contracted price. The opinion of Trial Judge Colaianni follows:

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: In this action, plaintiff, Bromley Contracting Co.,

Inc. ("Bromley"), a construction firm with its principal place of business in Valley Stream, New York, seeks reformation of its contract with the Government due to an alleged bid mistake. For reasons hereinafter set forth, it is concluded that reformation is an appropriate remedy and that plaintiff is entitled to recover.

## I. *Background Facts*

On May 29, 1973, the Department of the Army issued an invitation for bids ("IFB") for contract DAHCO2–73–B–1737 for repointing the exterior of Building 745a at the United States Military Academy at West Point, New York. The IFB was broken down into five separate items (Item Nos. 1, A, B, C, and 2) and Bromley and three other contractors submitted bids on that basis.

Bromley's total bid was the lowest of the four, although it was slightly higher than the Government estimate. Defendant's estimate, Bromley's bid, and the next lowest bidder's bid, were as follows:

| Item No. | Government | Bromley | Next Lowest Bidder |
|---|---|---|---|
| 1 — Base Bid: Elevations A, B, C | $103,250 | $ 84,200 | $125,750 |
| A — Additive Bid: Elevations E, F, G | 15,000 | 18,750 | 26,000 |
| B — Additive Bid: Elevations D, K, L, M | 43,320 | 64,500 | 86,000 |
| C — Additive Bid: Elevations N, O, P | 5,000 | 14,650 | 15,000 |
| 2 — Elevations H, I, J | 129,990 | 124,434 | 145,900 |
| Total | $296,560 | $306,534 | $398,650 |

The other bids totaled $1,034,370 and $1,183,000, respectively.

The estimates which formed the basis for plaintiff's bid were made by Melvin Bloom, its vice-president, manager, and general superintendent. Upon examination of the drawings and the specifications, he prepared a layout sheet which contained his estimates of the amount of labor and materials necessary to accomplish each aspect of the job, and the estimated applicable rates. The total of his estimates amounted to $300,530. To determine if any modifications to his estimates were required because of conditions at the job site, Melvin visited West Point for an inspection of the building covered by the IFB. After determining that his work estimates were accurate, he returned to his office and left his layout sheet, work papers, and a note for his brother Howard, plaintiff's president, who was responsible for the actual preparation of all of plaintiff's bids, to submit a total bid of under $300,000.

After establishing that the bid would have to be broken down into five separate unit prices, Howard discussed the matter with Melvin over the telephone. During that telephone conversation Melvin attempted to explain to Howard how the total figure should be broken down into five unit prices. The brothers agreed that the total of the five unit prices should not exceed $298,434. But Howard Bloom, in performing the breakdown, mistakenly picked up one of the errors which Melvin had previously corrected, and therefore submitted a bid whose five unit prices totaled $306,534. Nevertheless, because the bid itself did not require a figure for the sum of the five items bid upon, Melvin and Howard Bloom did not find out until later that their actual bid was $306,534 rather than $298,434.

In 1973, Frank O'Donnell was a contract assistant to the contracting officer at West Point. His duties included processing construction contracts from the formation of an IFB to the ultimate award of the con-

tracts. He also routinely received all correspondence addressed to the contracting officer regarding proposed or ongoing construction contracts, and handled mistakes in bid matters for such contracts. Although there was no specific delegation of authority from the contracting officer to Mr. O'Donnell, the parties are agreed that O'Donnell's actions with regard to the review of bids, conferences with the Blooms, and recommendations to the contracting officer concerning the present contract were within his authority.

On Friday afternoon, June 15, 1973, the bids submitted in response to the IFB were opened. Mr. O'Donnell examined the bids for responsiveness and obvious mistakes. In this instance Mr. O'Donnell compared plaintiff's bid with the next lowest bidder's bid and the Government estimate, and concluded that there was no mistake on the face of plaintiff's bid and that it was responsive. On the basis of the comparison, he did not think that verification of plaintiff's bid was necessary.

On Monday morning, June 18, Howard Bloom called West Point to obtain the results of the bid opening. He was given the breakdown of the next lowest bidder and the totals of the other two bidders. After reviewing the bids, it was obvious to Howard that something was wrong and that his company had made an error in its bid. Because of the press of other business, it was necessary that he leave his office before he had an opportunity to discuss it with his brother. However, he left the bid results for his brother Melvin to see.

At about the same time, Mr. O'Donnell was having an abstract of the bids prepared and forwarded to the post engineer for his recommendation and comment. In a response dated June 19, the post engineer recommended that Bromley be awarded Item Nos. 1 and A since its prices for those items were fair and reasonable. Mr. O'Donnell, whose office is on the same floor as the post engineer's, received the response on June 19 or 20.

When Melvin Bloom saw the results of the bid opening that Howard had left for his review, he immediately suspected that an error had been made because Bromley's bid was almost $100,000 below the next lowest bidder. He reviewed his work papers but could not find any error, except for a couple of minor mathematical ones, until he removed a spring clip which covered a portion of his layout sheet. Under the spring clip was a note to remind himself to "add 19 and 10," the overhead and profit percentage rates which plaintiff intended to apply to this particular job, to each of the unit amounts before submitting the bid. Because of the spring clip, Melvin forgot to include the overhead and profit, and Bromley's bid was submitted at cost.

Immediately after discovering the mistake, Melvin Bloom had his brother write the contracting officer the following letter, which was mailed on June 19, 1973:

Relative to the above captioned project which bid opened on Friday June 15, 1973 we respectfully wish to advise you that we have discovered an error in our bid.

When we received the results by telephone yesterday and noticed the discrepancy between our bid and the next lowest bid and the two other bidders on the job, we spent the entire day rechecking our figures to determine if in fact a mistake was made.

We could find no error except for minor adjustments until we finally located the error which was so obvious and is one of the things that can happen in the press of business, especially during the rush of bidding prior to June 30.

The entire job was tabulated at cost figures which is the normal way we estimate our jobs. We then add our G & A and markup to the cost figures. If there is then unit prices to tabulate we do so with our markups included. This was not the case in this bid. The notation to add 19% plus 10% to our costs was at the top of the estimating sheet and this was covered by a wide spring clip which caused us to carry forth all our figures without any markup.

We sincerely regret any inconvenience this may cause,

 * * * * * *

Bromley never received a written response to its letter.

On June 20, plaintiff's letter was received at West Point by Mr. Frank O'Donnell. On the same day Mr. O'Donnell's secretary called Melvin Bloom to arrange a meeting between Melvin and O'Donnell on Friday, June 22, at approximately 10–10:30 a. m. at West Point. Melvin was not told to bring his work sheets and documents in support of his claim of mistake to the June 22 meeting.

At the meeting of June 22, which was attended by Howard and Melvin Bloom and Frank O'Donnell, the Blooms attempted to explain to O'Donnell the nature of their error and how it allegedly took place. Mr. O'Donnell indicated to them that no bid correction could be allowed because the bid was in line with the Government estimate, the Government engineers had already reviewed the bids and determined Bromley's to be fair and reasonable, and his office was bound by a $300,000 limit for awarding repair and rehabilitation type contracts such as the one in the present case.

The Blooms then stated that they would not be able to do the job at the bid price. O'Donnell responded that an award had already been recommended for them and was being processed, reminded them of their bid bond guarantee, and mentioned the possibility of default. At that point, the Blooms discussed the situation for a few moments and, because they felt threatened by the possibility of default, agreed to take the job.

Mr. O'Donnell then advised them, since Bromley's bid was over his office's limit of $300,000, that an award would be made for all items except Item C. The Blooms were surprised at this because they were still under the impression that they had bid $298,434, but O'Donnell showed them that the total of the five items upon which they submitted bids totaled $306,534. As Bromley's bid on Item C was $14,650, whereas the Government estimate for that item was only $5,000, the Blooms requested that Item C be included in the final award for they sensed that it was one of the few items upon which they could make a profit. The

Blooms suggested instead that the Base Bid (Item 1) be taken out of the award because they had obviously bid too low on it. O'Donnell indicated that an award was being processed for everything except Item C, which was the only item the engineers did not think was fair and reasonable.

No request for supporting documents was made at the meeting nor did the Blooms present any. They were never advised at the meeting that, if they could support their mistake claim by clear and convincing evidence, they might be able to correct or withdraw their bid.

On Monday, June 25, Bromley began working on the job. Bromley wanted to immediately commence work on the contract because it contained a clause which required that approximately 50 percent of the work, entitled "noise work," had to be completed by August 24, 1973, or the Government could default Bromley. A contract to perform all items except Item C was awarded to plaintiff on June 29, 1973, for $291,884 ($306,534 less $14,650) and plaintiff received a notice to proceed on the contract on July 25, 1973. Plaintiff ultimately completed the job in 1974.

On November 26, 1973, plaintiff initiated review of its mistake in bid claim on the administrative level. In a decision dated August 12, 1974, the Comptroller General stated: "We are convinced that a mistake occurred, and that it probably occurred in the manner alleged." However, it denied plaintiff's requested relief because "the evidence submitted does not establish the exact proof of the intended bid." Plaintiff unsuccessfully requested the Comptroller General to reconsider his decision on two different occasions.

Finally, on January 7, 1976, plaintiff filed its petition in this court seeking judgment against defendant in the sum of $80,900 with interest.

## II. *Discussion*

A. *Remedy of Reformation has been Resorted to in cases of "Overreaching" by Contracting Officer*

 There is no doubt that this court has the power to grant price increases to

contractors by reformation of Government contracts. *Chernick v. United States,* 372 F.2d 492, 497, 178 Ct.Cl. 498, 506 (1967); *Jones & Sears, Inc. v. United States,* 158 Ct.Cl. 162 (1962). Traditionally, courts have resorted to reformation, in instances of a mutual mistake, to conform the words of a contract to those the parties actually intended. *See Space Corp. v. United States,* 470 F.2d 536, 540, 200 Ct.Cl. 1, 8 (1972); *Bromion, Inc. v. United States,* 411 F.2d 1020, 1022, 188 Ct.Cl. 31, 35 (1969). The purpose of reformation is to make a defective writing conform to antecedent expressions on which the parties agreed. 3 Corbin on Contracts § 614 at 723 (1960). However, as expressed in *Burnett Electronics Lab., Inc. v. United States,* 479 F.2d 1329, 1333, 202 Ct.Cl. 463, 472 (1973):

> The remedy has been extended from its traditional area of application—mutual mistake by the parties—to include cases where the Government knew or should have known of a mistake in a bid costly to the bidder.

*See Fraass Surgical Mfg. Co. v. United States,* 571 F.2d 34, 215 Ct.Cl. 820 (1978); *Chris Berg, Inc. v. United States,* 426 F.2d 314, 192 Ct.Cl. 176 (1970). This is especially true where there is evidence of overreaching of the contractor by the Government. *Ruggiero v. United States,* 420 F.2d 709, 713, 190 Ct.Cl. 327, 335 (1970); *Chernick v. United States, supra.* In *Ruggiero, supra,* 420 F.2d at 713, 190 Ct.Cl. at 335, the court stated:

> [W]hat we are really concerned with is the overreaching of a contractor by a contracting officer when the latter has the knowledge, actual or imputed as something he ought to know, that the bid is based on or embodies a disastrous mistake and accepts the bid in face of that knowledge. The correction of the mistake, perhaps in the teeth of general conditions or specifications, by recision or reformation, represents an application of equitable principles in a legal action.

B. *The Substance of Plaintiff's Claim*

In the present case, plaintiff's claim for reformation is grounded on the following premises: (1) that it advised the contracting officer of a bid mistake after opening but prior to award; (2) that in a meeting with Mr. O'Donnell, the contracting officer's authorized representative, plaintiff was advised that it could neither correct nor withdraw its bid; (3) that it accepted the contract only because of fear of the possibility of default; (4) that all of Mr. O'Donnell's actions in that regard were directly in conflict with the pertinent provisions of the Armed Services Procurement Regulation ("ASPR"), 32 C.F.R. § 2.406 (1973); and (5) that, therefore, because of the overreaching on the part of the Government, and because recision is no longer possible, it is entitled to reformation of the contract price to the amount that it would have bid had the mistake, as alleged, not been made.

It should be noted that plaintiff's claim rests largely upon facts presented at trial and which have been found in the findings of fact appended hereto and outlined in the facts noted above in Part I. However, plaintiff's testimony was not the only factual version presented at trial. Defendant disputed the key factual points surrounding the mistake in bid claim and the June 22 meeting and presented a substantially different version of those events.

It is always difficult to resolve directly conflicting testimony. This is especially true where, as here, there is a dearth of probative evidence to substantiate the statements made by witnesses of both parties. Both sides presented sincere witnesses at trial, and have introduced sworn affidavits in addition to the trial testimony in support of their positions, but, aside from plaintiff's June 19 letter and internal notes written by each side, there is little documentary evidence of what occurred. Moreover, as noted by the Comptroller General, in its decision denying plaintiff's request for reconsideration, the two versions cannot be reconciled by some logical analysis.

Despite the difficulty, I have chosen to discredit the defendant's position and to adopt the plaintiff's version of the events surrounding its mistake in bid claim as the

correct one. I reach that decision primarily because of three factors: (1) the fact that the defendant's version, if accepted *in toto*, raises questions which defy logical explanation; (2) the existence of some objective evidence to bolster plaintiff's version; and (3) the lack of any supporting Government documentation when taken together with certain discrepancies in the testimony of the Government's chief witness, Mr. O'Donnell. However, since the decision regarding which version to believe is crucial to the proper resolution of this case, it is essential that the defendant's version also be presented and each of the above factors discussed in turn.

### C. *Defendant's Version of Facts*

Defendant's position with regard to the scenario of events surrounding plaintiff's bid mistake claim is based substantially upon the testimony of Mr. Frank O'Donnell. Mr. O'Donnell testified that on June 20, 1973, after having received plaintiff's letter of June 19 which alleged a mistake in its bid, he personally called the plaintiff, acknowledged receipt of the letter, and asked for supporting documentation and evidence. Although no follow-up letter was written to the plaintiff, Mr. O'Donnell presented at trial a brief note that he had written at the time of the call to record what had transpired.

Mr. O'Donnell then stated that on the morning of June 22 Howard and Melvin Bloom and their father appeared at his office without an appointment. Although he was busy, he agreed to meet with them. O'Donnell did not specifically recall whether he asked the Blooms for their supporting documentation at the meeting, but he was certain that no such evidence was offered. O'Donnell stated that he told them he could not correct their bid, because of his office's $300,000 limitation, but that they would be allowed to withdraw their bid with proper substantiation of the error. Thereupon, according to O'Donnell, the Blooms decided that they were willing to accept an award, withdrew their bid mistake claim, and volunteered to exclude Item C from any award

in order that the contract amount be under $300,000. O'Donnell stated that he did not have the engineer's recommendation at the time and, therefore, did not initiate the suggestion that Item C be eliminated. Moreover, the Blooms did not, according to Mr. O'Donnell's testimony, request that the Base Bid (Item 1) be excluded instead.

Mr. O'Donnell further testified that since he had not yet received the engineer's recommendation, the award of the contract had not yet been determined and, thus, the possibility of default could not have been and was not ever discussed. He stated that there was no threat of any adverse action against the plaintiff at the meeting.

As a result of the meeting, Mr. O'Donnell was of the opinion that the Blooms had withdrawn their bid mistake claim although he never requested or obtained a formal withdrawal of the claim from plaintiff. He testified that after the meeting he crossed out the personal note that he made to himself, regarding the initial telephone call to the Blooms, because he thought the whole issue had been resolved.

### D. *Factors Supporting Plaintiff's Version of Facts*

### 1. *Defendant's Version Raises Questions Which have no Logical Answers*

Perhaps the strongest point in plaintiff's favor is that defendant's scenario raises questions which simply defy logical explanation. Why, for example, would the Blooms initiate the idea of eliminating Item C from any potential award? It would not take a very astute businessman to note that Item C was one of the only items for which plaintiff had bid substantially higher than the Government estimate, whereas on Item 2 and especially Item 1, Bromley had obviously underbid. And yet, despite the fiscal disadvantage which plaintiff would experience from its "voluntary act," which is evident from a comparison of defendant's estimate and plaintiff's bid, O'Donnell maintained that the Blooms suggested deleting Item C and did not seek to have Item 1 eliminated.

Mr. O'Donnell's explanation for plaintiff's action was that Item C involved the fewest dollars and that plaintiff could thus have reduced its bid to below the $300,000 limit with the smallest dollar sacrifice. O'Donnell's explanation is logically unpersuasive for the additional reason that plaintiff's interests would have been better served by suggesting the elimination of Item A if its uppermost thought was to maximize the amount of the contract. The elimination of Item A instead of Item C would only reduce that dollar amount by an additional $4,100, and, at the same time, would eliminate an item which provided a smaller profit margin than Item C.

Attention next turns to Mr. O'Donnell's statement that he personally called plaintiff and asked for substantiation of its claim. What then would be the explanation for the Blooms' appearing at O'Donnell's office, 2 days later, without any supporting documents at all? Even if the Blooms were attempting to perpetrate a fraud upon the Government and manufactured the entire bid mistake claim, they would have come to that meeting armed with at least the bid papers and records that they later presented on three different occasions to the General Accounting Office and now to this court.

One possible explanation is that the Blooms, as fraudfeasors, had not yet had the opportunity to document their fraud. But that possibility is refuted by (1) the fact that their letter of June 19 had already described the nature of their mistake and, thus, presumably the layout sheet and other records already existed; (2) the testimony of Mr. Michael Shea, the defendant's witness and FBI auditor, who testified that the plaintiff's records were authentic and therefore, it may be inferred, not fraudulently prepared; and (3) the fact that the Blooms appeared at O'Donnell's office promptly after his alleged call and thus subjected themselves to whatever investigation that he chose to conduct.

I next turn to Mr. O'Donnell's statement that he did not have the engineer's report at the June 22 meeting and therefore finalization of the contract award could not have been and was not discussed. Once again, Mr. O'Donnell's statement defies understanding and makes the acts of plaintiff illogical and contrary to those of an ordinary prudent businessman. Particularly inexplicable is why Bromley began working on the job on Monday, June 25, if some understanding had not been reached. It is agreed that the official award was not made until June 29 and that a notice to proceed was not received by plaintiff until July 25, 1973. In addition, the record shows that plaintiff was motivated to begin work on the contract promptly because of the "noise work" clause. Nonetheless, it is hard to believe that plaintiff would have begun work on the contract without some assurance that it, in fact, had received the award. Yet, contrary to plaintiff's version, O'Donnell stated that there was neither a formal nor informal award made at the June 22 meeting.

Also unexplainable, if Mr. O'Donnell's version is correct, is why plaintiff was permitted to enter upon defendant's property and begin work. The only explanation for plaintiff's commitment of time and men on June 25, 1973, is that plaintiff assumed that a contract would be awarded to it.

2. *Objective Evidence Supporting Plaintiff's Version*

Another important factor in plaintiff's favor is the existence of objective evidence to support its claim of a mistake. First, it is to be noted that within one day of the bid opening, Bromley promptly advised the defendant in writing that its bid mistakenly did not include its overhead and profit. Plaintiff has continuously maintained this position throughout its proceedings with the GAO and in this lawsuit. Furthermore, mathematical errors on the face of the Government estimate indicate that it should have been increased by $15,306 to yield a total estimate of $311,866. In that event, Bromley's bid, either as originally intended ($298,434) or as actually submitted ($306,-534), would have been lower than the Government estimate as well as the lowest

by far of any bidder. Finally, when the testimony of Michael Shea, defendant's accounting expert, and the GAO opinion are considered together, further support for plaintiff's version is found. Shea stated that the bid papers and records were authentic, although he was uncertain whether plaintiff's layout sheet figures represented only cost or cost plus markup. But the GAO stated that it was convinced that a mistake had been made and probably in the manner alleged.

That opinion necessarily would imply that only cost figures were used by Melvin Bloom on the layout sheet, for that is the substance of the claimed error. Moreover, the GAO's reservation regarding the evidence of plaintiff's intended bid was found to be incorrect by Shea, who concluded that the GAO's method of calculating plaintiff's intended bid from its layout sheet was erroneous. Thus, Shea and the Comptroller General complement each other in presenting objective evidence supportive of plaintiff.

### 3. *Lack of Government Documentation and Discrepancies in O'Donnell's Testimony*

Still another significant factor which detracts from the Government's version is the lack of any supporting Government documentation. The lack of Government documentation when coupled with certain discrepancies in O'Donnell's trial testimony significantly undermines defendant's version of the facts. Although O'Donnell stated that he personally asked the Blooms during the June 20 telephone conversation to substantiate their claim, he also testified that he was too busy to follow up the phone call with a written request. Mr. O'Donnell, in addition, claims that the Blooms decided to withdraw their mistake claim at the meeting, but he did not have them sign any statement of withdrawal. Certainly, in light of relevant ASPR provisions and the course of action demanded by these provisions, documentation to support both of these alleged occurrences, if indeed they did occur, would have been of crucial importance to O'Donnell.

Another significant discrepancy concerns the post engineer's recommendation. At the trial Mr. O'Donnell first testified that he did not have the engineer's recommendation at the time of the June 22 meeting, and did not believe that he had received it by that time, even though it was dated June 19. Later, however, O'Donnell stated that he received the engineer's recommendation on June 19 or 20. Possession by Mr. O'Donnell of the engineer's recommendation at the June 22 meeting is important since it would support the Blooms' testimony that they were told that they could neither withdraw nor correct their bid because an award of the contract was being processed. In addition, the receipt by Mr. O'Donnell of the post engineer's report by June 19 or 20 makes his testimony that he did not initiate the discussion regarding the deletion of Item C, as well as his testimony that he was not in a position to threaten plaintiff with default, suspect.

Another discrepancy in O'Donnell's testimony concerns the phone conversation in which he allegedly asked the Blooms for verification of their bid mistake claim. He testified that the Blooms advised him that they would "send" (mail) the documents to him. If true, that bolstered his later testimony that he had requested the documents from them but had never made an appointment to meet with them. Moreover, in response to a follow-up question, O'Donnell further indicated that he was not concerned that the mailing of the documents would cause a delay in awarding the contract by the June 30 deadline.

In contrast, O'Donnell later stated that one of his chief concerns at the meeting of June 22 was getting the contract awarded by the June 30 deadline. If Mr. O'Donnell was concerned with awarding the contract by the June 30 deadline, it seems highly likely that he would have taken every precaution to assure the timely receipt of plaintiff's documents by requesting that plaintiff immediately post the documents or by suggesting an early meeting. However, Mr. O'Donnell did not testify that he sug-

gested either of these alternatives to plaintiff.

Although, if viewed separately, each of the factors discussed in Part II(D)(1)–(3) might be considered minor in importance, their cumulative effect requires the conclusion that plaintiff made a mistake in the manner alleged and that its version of the June 22 meeting is the correct one.

### III. Defendant did not Follow ASPR Requirements

The ASPR provisions set forth the proper procedure for handling a mistake in bid claim, and the facts of this case clearly indicate that Mr. O'Donnell made no effort to comply with this mandated procedure. Neither side alleges that the mistake here was an apparent clerical one (ASPR § 2.406–2). Rather, this is a situation where the bidder alleges a mistake and so advises the contracting officer before an award of a contract has been made. In that case, ASPR § 2.406–3(e)(1) provides:

> If a bidder alleges a mistake, the contracting officer will advise the bidder to make a written request indicating his desire to withdraw or modify the bid. The request must be supported by statements (sworn statements if possible) concerning the alleged mistake and shall include all pertinent evidence such as bidder's file copy of the bid, the original worksheets and other data used in preparing the bid, sub-contractors' quotations, if any, published price lists, and any other evidence which conclusively establishes the existence of the error, the manner in which it occurred, and the bid actually intended.

The applicable standards to be used in permitting correction or withdrawal are the following:

> (a) The Departments are authorized to make the following administrative determinations in connection with mistakes in bids, other than apparent clerical mistakes, alleged after opening of bids and prior to award.
>
> (1) Where the bidder requests permission to withdraw a bid and clear and convincing evidence establishes the exist-

ence of a mistake, a determination permitting the bidder to withdraw his bid may be made.

> (2) However, if the evidence is clear and convincing both as to the existence of the mistake and as to the bid actually intended, and if the bid, both as uncorrected and as corrected, is the lowest received, a determination may be made to correct the bid and not permit its withdrawal.
>
> \* \* \* \* \* \*

ASPR § 2.406–3(a).

 It is evident from a review of the controlling facts that the Government did not follow the applicable ASPR provisions in this case. When alerted to the allegation of a mistake, both by plaintiff's June 19 letter and during the June 22 meeting, O'Donnell should have inquired as to the exact nature of the error and its verification. O'Donnell, however, did not so inquire. Had he done so, he would have discovered the facts as they were developed at trial. Since Mr. O'Donnell did not make the type of inquiry required by ASPR § 2.406–3(e)(1), it is proper for me to impute to him a knowledge of the facts established at the trial of this case. See Ruggiero v. United States, 420 F.2d 709, 716, 190 Ct.Cl. 327, 340 (1970). The knowledge thus imputed to O'Donnell establishes that he overreached the plaintiff by accepting its bid, and not allowing either correction or withdrawal of it, even though he should have known that it was mistaken. This has been characterized as a "clear-cut violation of law," Chris Berg, Inc. v. United States, 426 F.2d 314, 318, 192 Ct.Cl. 176, 183 (1970), and since recision is no longer possible, reformation is an appropriate remedy in the situation. Ruggiero v. United States, supra; Chernick v. United States, 372 F.2d 492, 178 Ct.Cl. 498 (1967).

 Plaintiff, of course, must still establish by "clear and convincing" evidence what it would have bid absent the mistake in order to have the contract reformed to its intended bid. See ASPR § 2.406–3(a); Chris Berg, Inc. v. United States, supra, 426

F.2d at 316, 192 Ct.Cl. at 180. In *Chris Berg*, the court defined the meaning of the "clear and convincing" standard. In that case, the evidence reflected that the contractor had "rounded off" its original cost plus markup figure of $618,128 to $616,000 for bidding purposes. Faced with the fact that certain mistakes had resulted in the omission of costs totaling $41,121, the Government argued that the "gross reduction" of $2,128 in the contractor's original bid made it difficult to determine to what extent the bidder would have relied on the correct costs to bid any specific higher amount. The court stated:

> This reasoning cannot be carried too far. Even if the original bid is computed in the exact amount of the mistaken estimated costs plus usual markups, there remains some uncertainty whether a corrected higher bid would throw the bidder into a panic about losing the award to competitors. The Navy command, as we understand it, takes the position that this uncertainty always precludes reform. The trouble with this view is that it effectively nullifies the regulation and therefore, of necessity, must misconstrue it. One must be willing to believe the evidence is "clear and convincing" on the basis of a reasonable probability that the markup on the higher costs would be computed in the same way it was on the mistaken lower ones.

*Chris Berg, Inc. v. United States, supra,* 426 F.2d at 316, 192 Ct.Cl. at 180–81. It further explained that "we think an uncertainty within a relatively narrow range is not inconsistent with 'clear and convincing evidence' of what the bid would have been." *Id.,* 426 F.2d at 316, 192 Ct.Cl. at 181.

Plaintiff has established that its original estimated costs for the contract amounted to $300,530. Defendant has introduced a number of figures, ranging from $298,434 to $313,576, which, it asserts, might have been the total original bid figures of the plaintiff. Therefore, defendant contends that because of plaintiff's "lackadaisical and unpredictable method" of preparing and submitting bids, it is impossible to determine plaintiff's intended bid absent the mistake even within the relatively narrow range permitted by *Chris Berg*. That plaintiff may have been careless in preparing its bid is not at issue. *See Ruggiero v. United States, supra,* 420 F.2d at 713, 190 Ct.Cl. at 335; *Edmund J. Rappoli Co. v. United States,* 98 Ct.Cl. 499, 513 (1943). The fact is that the cost figures as originally estimated by Melvin Bloom and as reflected on plaintiff's layout sheet totaled $300,530. Mr. Shea, the FBI auditor, confirmed that and also noted that if the GAO had employed the same method of calculating the cost figures as Melvin Bloom originally did, it would have also arrived at the $300,530 amount.

■ Plaintiff's mistake was in not adding a markup for profit and overhead to the cost figures before submitting its bid. Plaintiff asserts that based on its usual bidding practice, 30 percent would have been added to the cost figures for the markup.

Defendant contends that plaintiff has not consistently applied a 30 percent markup figure on other bids for Government contracts, and that, at any rate, in his note to his brother explaining the mistake, Melvin Bloom added first 19 percent (for the overhead) to the cost figure and then added 10 percent (for the profit) to the combined amount, a method dissimilar to just adding a lump 30 percent amount.

Defendant's argument concerning plaintiff's inconsistency in applying a 30 percent markup figure is not, of itself, controlling in a resolution of the issue before me. If defendant could show that plaintiff always applied a fixed markup in every bid and could also show that the facts in this case establish a deviation from that fixed pattern, defendant may have been able to establish the kind of inconsistency required. But defendant is unable to show an inconsistency in this case. Indeed if anything is clear it is that plaintiff applied different markups in accordance with Melvin's evaluation of the job and the competition. In the case at bar the evidence of record clearly establishes that Melvin intended to apply

**460**

a 19 plus 10 percent markup to its invitation for bid for contract DAHCO2-73-B-1737.

I next consider defendant's argument that a 30 percent markup is different than applying a 19 percent overhead rate and an additional 10 percent profit rate.[1] Although there is some ambiguity presented by Melvin Bloom's note to his brother, Melvin testified that "19 and 10" is simply shorthand for a 30 percent markup, and that in calculating his bids when the "19 and 10" method is applicable, he always adds 30 percent, and not first 19 percent and then 10 percent, to the costs. Agent Shea concurred with this, noting that his review of plaintiff's records showed that plaintiff used a total figure for overhead and profit when "19 and 10" was designated. Moreover, in the closest comparable bid to this case which plaintiff has made, a bid for the repointing of another building at West Point involving similar work, which was opened one week after the opening of the instant contract, plaintiff employed the "19 and 10" method and added a 30 percent markup to its estimated costs.

Thus, plaintiff's intended bid absent the mistake would have been in the neighborhood of $390,689 ($300,530 + 30 percent ($90,159) = $390,689). However, plaintiff has established that its bidding practice is to bid slightly below its total estimate, especially when the estimate is an even, rounded figure, and to submit bids ending in "434." Plaintiff has suggested three possible amounts in the alternative for the total reformed contract bid, the lowest of which, $387,434, is adopted here. That figure would still be below the next lowest bidder's bid, would reflect a slight reduction in plaintiff's total intended estimate of $390,-689, end in "434," and would put plaintiff at

the bottom of a narrow range of uncertainty.[2] *See Chris Berg, Inc. v. United States, supra,* 426 F.2d at 316, 192 Ct.Cl. at 181; *Chernick v. United States, supra,* 372 F.2d at 497, 128 Ct.Cl. at 507. From that figure there must be subtracted $19,045, the cost ($14,650) plus 30 percent markup amount $4,395) for the Item C work not performed by plaintiff. This yields a reformed contract price of $368,389.

In *Ruggiero v. United States, supra,* 420 F.2d at 716, 190 Ct.Cl. at 339, the court noted that:

If persons seeking to do business with the Government are decently treated by it, there will be more of them and they will offer more favorable terms, while experiences such as the * * * [plaintiffs] have undergone, will, if common, cause many to take their business elsewhere.

The same comment is pertinent in the present case.

### CONCLUSION OF LAW

Plaintiff is entitled to recover $76,505 ($368,389 – $291,884 = $76,505), the difference between the reformed price and the contracted price, and such judgment is entered for plaintiff.

---

1. Mathematically speaking, defendant's position is unpersuasive. Assuming a cost of $100 and applying the 19 percent rate for overhead and a 10 percent rate for profit, plaintiff would have bid a price of $130.90 using defendant's argument. Using the straight 30 percent markup, plaintiff would come up with a price of $130. The figures are for all intents and purposes substantially the same.

2. Using the 19 and 10 calculations suggested by defendant would result in a bid of $393,394. It should be noted that the total figure would still be below that of the next lowest bidder. Since even with the correction of plaintiff's bid mistake there would be no displacement of one or more lower bids, reformation is still permissible under the circumstances of this case. *See* ASPR § 2.406-3(a)(3).